523 A.2d 347

**Nick A. FRISK, Jr., and Ricardi C. Gatto, Appellees,**

v.

**The NEWS COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued April 30, 1986.

Filed Sept. 26, 1986.

Reargument Denied Dec. 8, 1986.

Petition for Allowance of Appeal Denied July 31, 1987.

538

Samuel E. Klien, Philadelphia, for appellant.

John A. Conte, Conway, for Frisk, appellee.

Scott L. Melton, Conway, for Gatto, appellee.

Before DEL SOLE,* MONTEMURO and POPOVICH, JJ.

MONTEMURO, Judge:

This libel action arose out of the publication of two articles, on May 4 and 7, 1979, respectively, in appellant's newspaper, the New Castle News. (*See* Appendix).

* Judge Del Sole did not participate in the consideration or decision of this case.

Appellees' case was tried in the Court of Common Pleas of Lawrence County, before the Honorable George P. Kiester, Specially Presiding, and a jury. The trial commenced on October 24, 1984, and verdicts were rendered on November 9, 1984, in favor of appellee, Nick A. Frisk, Jr., in the amount of $100,000.00 and in favor of appellee, Ricardi C. Gatto, in the amount of $400,000.00. Subsequently, on November 10, 1984, the jury awarded punitive damages to each of the appellees in the amount of $175,000.00.

Thereafter, both appellant and appellees filed timely motions for post-trial relief. In an opinion and order dated May 20, 1985, the court below denied appellees motions for additur and delay damages, and further directed as follows:

## ORDER

NOW, this 20th day of May, 1985, Defendant's Motion for Judgment N.O.V. is denied.

If Plaintiff, Nick A. Frisk, Jr., files a remittitur of $125,000 on the punitive damage verdict within 20 days of notice of the filing of this Order, Defendant's Motion for a New Trial is denied, and it shall be entered on the verdicts as so amended. Otherwise, Defendant's Motion for a New Trial is granted.

If Plaintiff, Ricardi C. Gatto, files with the Court within 20 days of notice of filing of this order, a remittitur of $125,000 on the punitive damage verdict, Defendant's Motion for a New Trial is denied and judgment shall be entered on the verdicts as amended.

If a remittitur by Ricardi C. Gatto is not filed, Defendant's Motion for a New Trial is granted.

On May 28, 1985, each appellee remitted his punitive damage award in excess of $50,000.00. The respective judgments against appellant were accordingly entered *eo die* and this timely appeal followed.

Judge Kiester ably set forth the pertinent facts underlying this action:

Nick A. Frisk, Jr., and Ricardi C. Gatto brought this libel action alleging they were defamed by front-page

articles/news reports which appeared in the New Castle News, a daily newspaper published by the News Company, Defendant. In May of 1979, the time of the publications, Mr. Gatto was president of the Ellwood City Borough Council and Attorney Frisk was borough solicitor. The news reports were written by Dan Callahan, a reporter for Defendant, and they related to the 1976 zoning of, property in Ellwood City owned by Attorney Frisk.

The news story was based on an interview which Reporter Dan Callahan had with Roy Meehan and Martin Kovach following a meeting of the Ellwood City Planning Commission the evening of May 3, 1979. Mr. Meehan and Mr. Kovach were members of the Planning Commission.

The news item published May 4, 1979, was titled in large letters (½ inch high extending in length 11 inches)

'Officials expose tampered map'

The second news item published May 7, 1979, contained a photograph of the Frisk property on Fountain Avenue. Below the picture in large print were two titles:

*'Involving Frisk property'*
'Three zoning maps altered'

. . .

Each of the news items clearly, indisputably infer that Mr. Gatto and Attorney Frisk in 1976 had engaged in illegally altering the Ellwood City zoning map for the benefit of the Frisk property.

Primary elections were scheduled for May 15, 1979. It is highly noteworthy that Mr. Kovach, Mr. Meehan and Mr. Gatto were candidates for city council. Mr. Gatto blamed his defeat on the news stories written by Mr. Callahan and published on May 4, 1979, and May 7, 1979, in the New Castle News.

The evidence establishes that in July, 1976 Attorney Frisk and fourteen other property owners had requested zoning changes. The requested changes were placed by borough employees on various 'working' maps to aid the

Commission in understanding what the applicants requested. The zoning change requested by Attorney Frisk in 1976 had been denied by the Commission and was not included in the proposed zoning map, later approved by the Commission and submitted to the Borough Council for adoption.

After reading the May 4 article, Attorney Frisk that same evening made numerous phone calls including several to Mr. Callahan and Mr. Vosburg who was the managing editor of the New Castle News. Attorney Frisk offered proof that the accusation was false. He demanded a retraction and the printing of 'his side of the story.'

Attorney Frisk had been present in the borough building the evening of May 3. He had seen Mr. Callahan. Attorney Frisk demanded an explanation from Mr. Callahan as to his reason for not asking him at that time about the truth of falsity of the accusation. Mr. Callahan agreed to meet with Mr. Frisk at the Frisk law office on Saturday, May 5, 1976 [sic], at 9 A.M. When Mr. Callahan did not appear that morning, Attorney Frisk phoned and was told that Mr. Vosburg, the managing editor, was in charge of the story.

The false statements and inferences were re-published by Defendant on May 7, 1979. The denials transmitted to Defendant by Attorney Frisk were not published.

On Tuesday, May 8, 1979, Attorney Frisk obtained a statement from Thomas A. Stoner who had been administrative assistant to the borough manager in 1976. This statement explained the work maps and what had been done with these maps in 1976. A copy of this explanation was given to the New Castle News on May 9 or May 10, 1979. Neither the statement of Mr. Stoner nor the denials of Mr. Frisk and Mr. Gatto were published.

At trial Mr. Callahan who was available to both parties was not called as a witness. The Court sustained Defendant's objection to Plaintiff's offer of the deposition of Mr.

Callahan. The reason was that the deposition failed to meet the requirements of the Rules of Civil Procedure.

Witnesses for Plaintiffs testified that the reputations of the Plaintiffs had been harmed by the news stories. On the other hand, defense witnesses testified that the reputations of the Plaintiffs for honesty and integrity prior to May 4, 1979 was [sic] bad.

The foregoing is an abbreviated version of the evidence in the case. The evidence is undisputed that neither Attorney Frisk nor Mr. Gatto or anyone else had altered the borough zoning maps.

Lower court opinion at 4–7.

As framed by appellant in its "Statement of the Questions Involved", the following issues are presented for our consideration:

1. Was the jury verdict in this public official defamation action against the weight of the evidence in that Plaintiffs [appellees] failed to prove by 'clear and convincing evidence,' that the articles in suit were published with actual malice?

2. Was Defendant [appellant] denied due process of law by the trial court's Order, which precluded cross-examination of Plaintiffs and their reputation witnesses on Plaintiffs' involvement in public events, an involvement which was at odds with their sworn testimony and was centrally relevant to the damages sought?

3. Is Defendant entitled to a new trial because the damage award was predicated on counsel's remarks, found by the trial court to be prejudicial, and because the compensatory award is grossly excessive?

Appellant's brief at 3.[1]

■ In reviewing the denial of appellant's motion for judgment *non obstante veredicto*, we are guided by the

1. We note that, at 69 pages of conventional typographical printing, appellant's brief grossly violates Pa.R.A.P. 2135. However, given the duration and complexity of the proceedings below, we will invoke Pa.R.A.P. 105 and accordingly "disregard the requirements or provisions" of Rule 2135.

standard established in the landmark case of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It is undisputed that appellees herein were "public figures" and therefore the first amendment, as interpreted in *Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26, precludes recovery in the absence of clear and convincing evidence that appellant's allegedly defamatory series was published with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* In *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the Supreme Court recently noted:

> The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. *See, e.g., New York Times Co. v. Sullivan,* 376 US, at 280, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 ALR2d 1412; *see also Gertz v. Robert Welch Inc., supra,* 418 US [323], at 342, 41 L.Ed.2d 789, 94 S.Ct. 2997[, at 3008]; *St. Amant v. Thompson,* 390 US 727, 731, 20 L.Ed.2d 262, 88 S.Ct. 1323 (1968); see generally W. Prosser, Law of Torts 771–772, 821 (4th ed 1971).

*Id.* 466 U.S. at 511, n. 30, 104 S.Ct. at 1965. Furthermore, in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, n. 30, 20 L.Ed.2d 262 (1968), the Court instructed:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 731, 88 S.Ct. at 1325. *See also Sprague v. Walter,* 357 Pa.Super. 570, 516 A.2d 706 (1986).

544

As an appellate court, we additionally are mindful that in cases of this nature the Supreme Court has directed that we conduct a fully independent review of the evidence adduced to avoid any "forbidden intrusion on the field of free expression." *Sullivan*, 376 U.S. at 285, 84 S.Ct. at 728. *See also Bose, Corp., supra; Time, Inc. v. Page*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Sprague, supra.*

■ We have reviewed *in toto* the over two thousand pages of trial testimony generated by this action. The facts as found by the court below, and as set forth above, accurately detail the circumstances demonstrated by the record before us. With respect to the instant issue, the court below concluded, "There is lacking evidence that Defendant published the defamatory statements with knowledge of their falsity. On the other hand, the evidence is clear and convincing that Defendant published the articles with reckless disregard for the falsity." Lower court opinion at 8. We agree.

The opening sentence of the May 4th, 1979 article sets the tenor: "Ellwood City Borough Council president Rick Gatto gave the Borough's Planning Commission a zoning map in 1976 that was illegally altered to benefit borough solicitor Nick A. Frisk." Imputations of unlawful conduct on the part of Mr. Frisk and/or Mr. Gatto continue throughout the May 4th article and are reasserted even more expansively in the subsequent May 7th article. As demonstrated at trial, neither Mr. Frisk nor Mr. Gatto engaged in any wrongful conduct. The alterations appearing on the commission's "working" maps were executed at the behest of the commission itself by the assistant borough manager, Thomas Stoner.

The publication of the May 4th and 7th articles is marked by the clear departures from acceptable journalistic procedures: (1) the utter lack of adequate pre-publication investigation; (2) the use of wholly speculative accusations and accusatory inferences; and (3) the failure to utilize or employ effective editorial review. We therefore are of the opinion that appellees have sufficiently proven that appel-

lant must have entertained serious doubts as to the truth of its publications. *See St. Amant, supra.*

Accordingly we affirm the denial of appellant's motion for judgment *n.o.v.*

■ Appellant's next general contention is that the court erred in limiting appellant's cross-examination of appellees and of appellees' reputation witnesses. The court below ruled impermissible any questioning by appellant concerning other negative publicity implicating appellees in unrelated political and professional controversies.

Preliminarily, we reiterate,

The scope and extent of cross-examination traditionally rests within the sound discretion of the trial judge. '[C]onsiderable latitude must be left to the trial judge, and his action will not be reversed in the absence of an abuse of discretion or unless an obvious disadvantage resulted therefrom to the other party.' *Woodland v. Philadelphia Transport Co.*, 428 Pa. 379, 386, 238 A.2d 593, 596 (1968).

*Cooper Plumbing, Inc. v. Macioce*, 225 Pa.Super. 236, 238, 310 A.2d 411, 412 (1973).

During its cross-examination of both Mr. Frisk and Mr. Gatto, appellant attempted to introduce evidence of newspaper articles published principally in another local newspaper, the Ellwood City Ledger, which were unfavorable to appellees. Appellant's theory was that such evidence should be admissible in mitigation of the damages which appellees claimed resulted from appellant's May 4th and 7th articles. Citing our supreme court's opinion in *Bausewine v. Norristown Herald, Inc.*, 351 Pa. 634, 41 A.2d 736, *cert. denied*, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945), the court denied the proffered evidence and restricted any related questioning.[2] In *Bausewine*, a local police chief

---

**2.** With respect to appellant's cross-examination of Mr. Gatto, the court below permitted appellant to utilize portions of a letter written to the Ellwood City Ledger by Mr. Gatto in which he attributed to certain Ellwood City Ledger articles damages herein claimed as resulting from appellant's articles. However, in all other respects, the limita-

sued the publisher of the Norristown Times Herald newspaper for libel. The appellant/newspaper therein subsequently moved for a new trial on the basis of after-discovered evidence in that, following the trial of appellee's libel action, appellee was found guilty in local criminal court of accepting a bribe and of nonfeasance in office. The *Bausewine* court observed,

> *At most, it was a subsequently transpiring occurrence which if known at the time of the trial now under review, would not have been admissible.* The learned court below therefore correctly overruled that ground as furnishing no reason for a new trial. *While it is permissible to show that one claiming damages for injury to his reputation has a bad reputation, proof of separate acts of bad conduct or guilt of criminal offenses is not admissible on an issue of general reputation, not even to mitigate damages. Pease v. Shippen,* 80 Pa. 513, 515, 516, 21 Am.Rep. 116. *Moreover, that issue must be related to the time of the alleged injury. Hopkins v. Tate,* 255 Pa. 56, 60, 61, 99 A. 210. *Nor was the plaintiff's conviction relevant to the defamation in the defendant's publications. Cf. Moyer v. Moyer,* 49 Pa. 210, 211; *Conroe v. Conroe,* 47 Pa. 198, 201.

*Id.,* 351 Pa. at 646, 41 A.2d at 742 (emphasis added).

Appellant's attempt to use articles detailing unrelated specific acts of misconduct by appellees in order to mitigate damages was properly thwarted. We similarly so hold with respect to appellant's attempt to use the same or similar unrelated articles to test the credibility of appellee' reputation witnesses.

We find the appellant's proposed usages of the articles to have been impermissible, and within the trial court's discretion to limit, for the following reasons: (1) the subject matter of the articles offered were wholly unrelated and irrelevant to the accusations contained in appellant's May 4th and 7th articles, *Bausewine, supra;* (2) any probative

tions on the use of unrelated articles in the cross-examinations of both Mr. Frisk and Mr. Gatto were identical.

value which the articles may have possessed was substantially outweighed by the danger of unfair prejudice to appellees, confusion of the issues and misleading the jury, *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 22, 473 A.2d 584, 588 (1984); and (3) the use of specific acts of misconduct in mitigation of damages is "wholly without bearing on the proposition in issue; that is, they show merely, in the neat phrase of Mr. Justice Cave, 'not that the plaintiff has not, but that he ought not to have, a good reputation' (*Scott v. Sampson*, [1881–1885] All E.R. 628, 8 Q.B.D. 491, 505 (1881))," 1A Wigmore, *Evidence* § 70.2 (Tillers rev.ed. 1983). Furthermore, appellant, through its own witnesses, was able to rebut appellees' damage claims and reputation witnesses. As the court below observed, "Defendant called several witnesses including those who made the defamatory statements. These witnesses were articulate and impressive in their testimony as to the bad reputations of the Plaintiffs. The record establishes that Attorney Frisk at least was a controversial person in Ellwood City." Lower court opinion at 8.[3]

■ Appellant's next argument is that the punitive damage awards must be stricken as having been influenced by an allegedly improper remark during the closing argument by Mr. Frisk's counsel. Addressing the jury with respect to punitive damages, counsel stated:

> [MR. CONTE:] I would like to say I also participated to some extent in that because I also had faith in the jury system and from the compensatory verdict, yes, I will

---

**3.** Appellant additionally argues that the court below erred in not permitting the use of articles published prior to the May 4th, 1979, unfavorable to appellees, for the purpose of demonstrating appellant's "state of mind", i.e., appellant's reason to believe in the truth of its accusations. In so far as appellant appears not to have raised this issue at trial and to have failed to suggest it instantly in appellant's "Statement of the Questions Involved," the issue would seem waived. *See Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974); Pa.R.A.P. 2116. Nevertheless, appellant's contention is patently untenable in that the articles, which appellant allegedly relied upon in presuming the truth of its own accusations, bore no substantive similarity to appellant's accusations. *See Sharon v. Time Inc.*, 103 F.R.D. 86 (S.D.N.Y.1984)

receive what we call a contingent fee, forty percent as the attorney. I have faith this will be done. My associate and I will receive such a fee.

N.T. November 10, 1984, at 280. Appellant's counsel thereupon immediately objected:

MR. AUDINO: Pardon me, Your Honor, I have to object to this. By introducing the fee he is going to get out of the compensatory award, he is saying to this jury now the amount of that award is going to be reduced by my fee. That is his argument for the punitive damages.

*Id.*

As we found in *Austin v. Harnish*, 227 Pa.Super. 199, 205, 323 A.2d 871, 874 (1974), "As to an allegedly inflammatory remark made by defense counsel in his closing argument, we find that any prejudicial effect of the remark was cured by the court's instruction to the jury to disregard it. *See Commonwealth v. Cisneros*, 381 Pa. 447, 113 A.2d 293 (1955)." In the instant case, upon the objection of appellant's counsel, the court below instructed the jury as follows:

THE COURT: That is totally irrelevant and the jury is instructed to disregard that. What arrangement the parties have is not in the record here, and this is introducing something else to the—into the case and this will be stricken from the record, and I instruct the jury to ignore that statement by Mr. Conte.

N.T. November 10, 1984, at 281–82.

While we find that the contemporaneous instruction to the jury cured any effect which the remark may have otherwise had upon the punitive damage awards, we note that the awards were ultimately remitted by approximately seventy percent (70%). In its opinion, the court below stated:

During closing arguments on punitive damages, Plaintiff's counsel referred to a 40 percent fee arrangement which was not a matter of record. This was improper, prejudicial argument which the Court instructed the jury to ignore. As noted by defense counsel, the award of

$175,000 in punitive damages to each Plaintiff would leave each Plaintiff with the full amount of the compensatory verdict.

Under the circumstances it is the opinion of the Court that a fair, reasonable amount in punitive damages would be $50,000 for each Plaintiff. This amount when considered with the compensatory verdicts inflicts adequate punishment and penalty on Defendant.

Lower court opinion, at 11.

Appellant's argument that the punitive damage awards must be stricken due to the perceived effect of counsel's remarks is clearly without basis.

Furthermore, in light of the significant remittiturs ordered herein, we find appellant's allegation that the punitive damages were excessive to be specious at best. In *Daley v. John Wanamaker, Inc.*, 317 Pa.Super. 348, 353, 464 A.2d 355, 357–58 (1983), we observed that it is within a trial court's discretion to order remittiturs of excessive verdicts. The court below found the punitive damages awarded herein to have been excessive yet nevertheless found a modified amount of punitive damages to have been warranted. We are of the opinion that the trial court acted properly and that, in light of the extreme departure from acceptable journalistic practices evidenced herein, the judgment ultimately entered with respect to punitive damages were appropriate. *See Marcone v. Penthouse International, Ltd.*, 577 F.Supp. 318 (E.D.Pa.1983), *rev'd*, 754 F.2d 1072 (3d Cir.) *cert. denied*, — U.S. —, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963).[4]

---

4. Appellant has additionally argued that punitive damages are constitutionally impermissible in "public figure" libel actions. Again in so arguing appellant has violated Pa.R.A.P. 2116. Nevertheless, we readily dispose of this argument by quoting Mr. Justice Harlan in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 161, 87 S.Ct. 1975, 1994, 18 L.Ed.2d 1094 (1967), wherein he stated with respect to libel actions:

We would hold therefore, that misconduct sufficient to justify the award of compensatory damages also justifies the imposition of a punitive award, subject of course to the limitation that such award

■ With respect to the compensatory damage awards, appellant urges that the court below improperly charged the jury. Appellant takes issue with the following instruction:

> If you find the the Defendant acted either negligently or with reckless disregard in publishing a false and defamatory communication, you may *presume* that the Plaintiff suffered both injuries to his reputation and the emotional distress, mental anguish, and humiliation such as would result from such a communication. This means you need not have proof that the Plaintiff suffered emotional distress, mental anguish and humiliation in order to award him damages for such harm because such harm is presumed by the law when a defendant publishes a false and defamatory publication with the knowledge that it is false or in reckless disregard of whether it is true or false.

N.T. November 9, 1984, at 227 (emphasis added).

The Civil Instructions Subcommittee proposed the following pertinent instruction, defining, in part, defamation damages:

> B. If you find that the defendant acted either intentionally or recklessly in publishing the false and defamatory communication you may presume that the plaintiff suffered both injury to his reputation and the emotional distress, mental anguish and humiliation such as would result from such a communication. This means you need not have proof that the plaintiff suffered emotional distress, mental anguish and humiliation in order to award him damages for such harm because such harm is presumed by the law when a defendant publishes a false and defamatory communication with the knowledge that is false or in reckless disregard of whether it is true or false.

Pa.S.S.J.I. (Civ) 13.10(B). As is evident, the instruction provided by the court below mirrors, in all material re-

is not demonstrated to be founded on the mere prejudice of the jury.

spects, that proposed by the subcommittee, and both are in complete accord with the Supreme Court's decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (recovery of presumed damages is constitutionally permissible where liability is based on a showing of "actual malice"). With regard to this issue, we are of the opinion that further comment is unnecessary.

■ Finally, appellant argues that the compensatory damage awards were excessive. In *Baird v. Dun & Bradstreet,* 446 Pa. 266, 285 A.2d 166 (1971), our supreme court observed:

[T]he grant of a new trial because the verdict was excessive (or inadequate) lies within the sound discretion of the trial Court and will be sustained by an appellate Court in the absence of a clear abuse of discretion or an error of law which controlled the verdict or the outcome of the case. *Black v. Ritchey,* 432 Pa. 366, 248 A.2d 771; *Tranter v. Mandelbaum,* 427 Pa. 326, 234 A.2d 845; *Connolly v. Philadelphia Transportation Company,* 420 Pa. 280, 216 A.2d 60.

*Id.,* 446 Pa. at 276, 285 A.2d at 172. The trial court herein concluded, "It is the opinion of the Court that the awards of compensatory damages to Nick A. Frisk, Jr. and Ricardi C. Gatto is [sic] not excessive and should not be reduced." Lower court opinion, at 10.

Having carefully considered appellant's brief and the evidence adduced, we are of the opinion that, in so concluding, the trial court neither abused its discretion nor erred with respect to the pertinent law.

In light of the foregoing, we affirm the judgments entered below.

Judgments affirmed.

# NEW CASTLE NEWS

NEW CASTLE NEWS, FRIDAY, MAY 4, 1979 —24 Pages AND PREVIEW TV TAB

## Officials expose tampered map

ELLWOOD CITY — Ellwood City Borough Council president Rick Gatto gave the Borough's Planning Commission a zoning map in 1976 that was illegally altered to benefit borough solicitor Nick A. Frisk.

"Someone altered the map in a rather amateurish fashion," Roy Meehan said at a commission meeting last night. "We don't know who did it, but Rick Gatto gave us the map."

The map was altered to give Frisk a commercial zone on property he owns on the block of Fifth Street between Fountain and Spring avenues. His office is on the same block.

The original map correctly zoned Frisk's property as B-residential, bordering the downtown, which was zoned commercial. The commercial legend was shown by slanted lines and the residential legend was a shaded area.

Someone extended the slanted lines across Spring Avenue to Frisk's property.

Both Gatto and Frisk were unavailable for comment this morning.

The commercial zoning would be desirable on the busy stretch of Fifth Street. The alteration for Frisk's property is apparently the only change on the map.

A zoning map was being drawn up by the commission at the time and the change could have gone unnoticed and on to the map. But the change probably would be spotted when the map was given to the Borough Council.

Meehan said the commission immediately spotted the changes.

"We saw the change right away," he said with a laugh.

There have been rumors in Ellwood City about an altered map and Meehan was the first official to confirm the story.

The map was taken from the Borough building in June, 1976, and it was presented by Gatto to the Planning Commission in July, 1976.

"Yes, someone altered the map," commission member Martin Kovac said. "But we don't know who. I don't remember who brought it in."

The Borough Planning Commission held a public hearing last night on a newly proposed zoning map. Most of the people who asked questions and made comments were about the commission's plan to change the zoning for some parts of the borough from commercial to residential.

Commission chairman Marvin Luxenberg said there had been a few changes as possible, but the commission wanted to eliminate some of the commercial areas outside of Lawrence Avenue.

"We're trying to get the main street (Lawrence Avenue) zoned as the only commercial area," Luxenberg said. "We're trying to reduce the number of commercial districts as much as possible. We have the same amount of commercial area as New Castle and they're five times as big."

Some of the residents are owners of vacant lots that have been zoned commercial but will be changed to residential with the new map. One of the changed areas is a strip of Wampum Avenue that would be changed from commercial to residential.

"Wampum Avenue should be zoned commercial," Mary Fontana, 500 Todd Ave., said. "We have to look to the future."

Commission members said they will meet several times to discuss possible changes before recommending a map to the borough council.

— By DAN CALLAHAN

gasoline rationing plan and energy proposal which has left

New Castle News Photo

*The property owned by Ellwood City solicitor Nick A. Frisk that was changed on zoning map to commercial*

## Involving Frisk property

# Three zoning maps altered

**By DAN CALLAHAN**
News Staff Writer

ELLWOOD CITY — At least three Ellwood City zoning maps have been altered to give commercial zoning to property owned by borough solicitor Nick A. Frisk.

A negative, and two work maps were altered by extending slanted lines over Frisk's property on Fifth Street between Fountain and Spring Avenues.

The negative has "Mr. Gatto" scrawled in the right hand corner.

In addition to the three maps, one print was made from the negative.

The maps were obtained from the Ellwood City Borough building this morning.

Planning Commission member Roy Meehan was the first official to reveal that Borough Council president Rick Gatto gave one of the altered work maps to the commission in July, 1976.

"Someone altered the map in a rather amateurish fashion," he said Thursday night. "We don't know who did it, but Rick Gatto gave us the map."

Lawrence County Planning Director Thomas Grainey said that changing the work maps was probably not illegal. "The work maps have no official standing," Lawrence

*Slanted lines show the change*

County Planning Director Thomas Graney said. "If someone changed the newly proposed map then that would be an issue."

On the work maps the lines have been drawn in sloppily with a slightly different type of red pencil, and the outline of the block is in black.

The residential area was indicated by horizontal yellow lines and seemed to have been erased on the work maps.

The original change was made on the work maps and was transferred to a negative. A zoning map was being drawn up by the commission in July, 1976, and the change, conceivably, could have gone unnoticed and onto the official map, had it not been caught by commission members.

There had been rumors in Ellwood City about the altered maps, and the several zoning maps in existence have served to confuse the issue.

Frisk tried unsuccessfully to get the property zoned commercial by the Planning Commission in July, 1976. The block contains a gas station and a funeral home, along with Frisk's office, but if they were to be torn down and changed they would revert back to residential.

Frisk owns at least five parcels of property in Ellwood City. He bought the Fifth Street parcel in two parts, one from Columbia Gas in June, 1974, and the other from a private citizen in May, 1975, for a total of $81,000.