566 A.2d 901

**William SAVITSKY, Appellant,**

v.

**SHENANDOAH VALLEY PUBLISHING CORP., t/d/b/a Evening Herald of Shenandoah, Mahanoy City and Ashland and William O'Brien; Evening Herald of Shenandoah Mahanoy City, and Ashland and Shenandoah Valley Publishing Co., t/d/b/a Evening Herald of Shenandoah, Mahanoy City and Ashland.**

Superior Court of Pennsylvania.

Argued Sept. 21, 1989.

Filed Dec. 1, 1989.

Kimberly D. Borland, Wilkes–Barre, for appellant.

Elihu A. Greenhouse, Philadelphia, for appellees.

Before TAMILIA, KELLY and CERCONE, JJ.

TAMILIA, Judge:

Appellant William Savitsky appeals an Order granting summary judgment to appellees Shenandoah Valley Publishing Corporation publisher of the Shenandoah "Evening Herald" (hereinafter "Evening Herald"), and William O'Brien, former editor of the "Evening Herald". The underlying libel action instituted by appellant was initiated by writ on March 26, 1982 and a complaint was filed on March 25, 1983 alleging various publications in the "Evening Herald" defamed appellant. Following responsive pleadings and new matter and after discovery, appellees filed a motion for summary judgment which was argued before Judge William Rubright on September 26, 1988. By Order dated and filed December 14, 1988, the court entered summary judgment in favor of appellees, and this appeal followed.

The publications which appellant alleges defamed him are of two types, and their factual underpinnings are as follows.

Appellant was a member of the District 25 International Executive Board of the United Mine Workers of America and was a losing candidate for reelection to that office in an election held June 9, 1981. The June 13, 1981 edition of the "Evening Herald" reported appellant had been ferried around the region to polling places on election day by a coal company helicopter, a report appellant categorically denies and which appellees have never proven.

The second category of publications appellant alleges defamed him concerned references to appellant as a "widow robber" in connection with a union life insurance benefit package negotiated chiefly by appellant. These references occurred in newspaper articles and editorials between January, 1980 and June, 1981.

This Court is not unmindful of the delicate balance required in public figure defamation cases. Free speech is considered such a vital aspect of our constitutional freedoms, it must be given breathing room in the form of protected, uninhibited, robust debate and even erroneous statements if the press is to avoid the self-censorship that is manifestly incompatible with the open exchange of ideas in our society. Therefore,

> While we recognize that summary judgment is 'a proper vehicle' for disposing of potentially frivolous suits that threaten First Amendment freedoms, we find that summary judgment should be granted only when warranted under Pa.R.C.P. No. 1035, i.e., where the evidence viewed in the light most favorable to the non-moving party, reveals an absence of a genuine issue as to the existence of actual malice....

*Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super. 588, 599, 422 A.2d 625, 631 (1980) (citation omitted).

As to appellant's claim concerning the defamatory nature of the report of his alleged helicopter ride, appellant has framed the question on appeal as follows:

> Is there a genuine issue of fact as to whether the [appellees] published the report that the [appellant] union candidate was transported from polling place to polling place by means of a coal company management helicopter in reckless disregard for the truth of [sic] falsity of the report and, therefore, with actual malice toward the [appellant]?

Brief of Appellant at 15.

Defamation and libel decisions occupy a place at the forefront of our modern legal tradition, involving as they do vital issues in the areas of both constitutional and tort law.

While those decisions contain exhaustive histories leading to our present legal standards, such analysis is beyond the range of our decision in this case, and so our decision will focus on the prevailing legal standards and applicable historical precedents.

Ordinarily, the initial consideration of a court in a libel action is whether the plaintiff is a public or private figure. In the instant appeal, appellant does not dispute he is a public figure, even if only for a limited purpose, and we are not compelled to discuss the expansion of the *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), actual malice test from public officials to public figures (*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)) to limited purpose public figures (*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Therefore, appellant must prove by clear and convincing evidence Shenandoah published the June 13, 1981 article with actual malice, i.e., with knowledge it was false or with reckless disregard of its truth or falsity. *Sullivan, supra.* As appellant has made no contention the newspaper or the article's author, O'Brien, knew the article was false, we will focus our determination of the existence of actual malice on appellees' reckless disregard of the article's truth or falsity.

"The term 'reckless disregard' cannot be fully encompassed in one infallible definition." *Stickney v. Chester County Communications, Ltd.*, 361 Pa.Super. 166, 171, 522 A.2d 66, 69 (1987). Moreover, the United States Supreme Court has stated:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

However, the Court in *St. Amant* went on to declare mere good faith assertions by the publisher of his belief the defamatory statements were true will not ensure a favorable verdict where "the publisher's allegations are so inherently improbable that only a reckless man would put them into circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 390 U.S. 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268.

Viewed in light of these decisions, the facts of the case sub judice lead this Court inexorably to the conclusion the actions of the newspaper and O'Brien exhibited recklessness such as a jury might reasonably find to constitute actual malice.

Testifying at deposition, appellee O'Brien, the author of the helicopter report, stated he took his unnamed informant's word for the accuracy of the information appellant was airlifted on election day by a coal company helicopter. O'Brien also testified he did not know whether the informant had ever provided him with information in the past, and O'Brien could not recall whether he had asked the informant any other questions about the information supplied. O'Brien further testified he did not call appellant or anyone else to confirm the report, although appellant had provided O'Brien with information in the past, O'Brien had always found appellant's information to be reliable, and O'Brien knew how to contact appellant. Such careless journalistic procedure might still be afforded constitutional protection in a situation where the report was a "hot news" item and the need for immediate publication precluded attempts at verification of all questionable information. *See Curran v. Philadelphia Newspapers, Inc.,* 376 Pa.Super. 508, 546 A.2d 639 (1988). However, four days elapsed between the date of appellant's alleged helicopter campaigning and publication of the article in which it is mentioned, although the "Evening Herald" was published daily in the

interim. In addition, appellees did not attempt to contact any person who may have been at a polling place visited by appellant to verify the report. Clearly, the "press of time" is inapplicable in this situation.

We find it highly unlikely despite the deposition assertions by O'Brien and Joseph Wallace, publisher of the newspaper, that they did not attach any particular import to the article they were publishing, or the significance it might have to readers of the newspaper. Detached by time and distance from the article, the impact of a report that an incumbent union official campaigning for reelection was transported from polling place to polling place by a coal company helicopter is still not lost on us. Nonetheless, Wallace testified as a son of a coal miner and a long-time spectator to union-management affairs in that part of the state, he had no opinion as to whether the alleged conduct of appellant speaks well or ill of him as a candidate for union office. O'Brien testified although he considered the report newsworthy, he did not attach any importance to it. O'Brien testified he felt the newsworthiness of the report sprang solely from the fact appellant was using modern means of transportation for campaigning, and not any implicit support for appellant by coal mine operators. In an area dominated by the anthracite coal industry and punctuated by rancorous union-management relations, the disingenuousness of these remarks approaches the incredible.

For these reasons, we find the newspaper's allegations so inherently improbable appellees have come close to "willfully blinding" themselves to the falsity of the report. *Di-Salle v. P.G. Publishing Co.*, 375 Pa.Super. 510, 520, 544 A.2d 1345, 1350 (1988). We also follow the test set forth in *Frisk v. News Co.*, 361 Pa.Super. 536, 523 A.2d 347 (1986), to find appellees' June 13, 1981 article marked by clear departures from acceptable journalistic procedures: (1) the utter lack of adequate pre-publication investigation; (2) the use of wholly speculative accusatory inferences; and (3) the failure to utilize or employ effective editorial review. *Id.*, 361 Pa.Superior Ct. at 544, 523 A.2d at 351. Therefore, as

we find "there appears a genuine issue of fact from which a jury could reasonably find actual malice with convincing clarity," *Brophy, supra,* 281 Pa.Super. at 595, 422 A.2d at 632, we reverse the Order of the trial court granting summary judgment on the issue of the June 13, 1981 "Evening Herald" article. As a result, we will not discuss this appeal in terms of appellant's suggested application of the Shield Law, 42 Pa.C.S. § 5942(a).

■ Appellant next argues the court erred in holding the references to appellant as a "widow robber" were not capable of defamatory meaning. The court must analyze the alleged defamatory statements in context, *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987), to determine "the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 447, 273 A.2d 899, 907 (1971), citing *Boyer v. Pitt Publishing Co.,* 324 Pa. 154, 157, 188 A. 203, 204 (1936). We agree with the trial court's analysis of the context and effect of the newspaper references to appellant as a "widow robber" and cite with approval a portion of its Opinion:

The term "widow robber" first appeared in an article published on January 7, 1980. The article consisted almost entirely of a statement submitted to the Defendants by the members of Shenandoah Local 1443 of the UMWA. In that statement, the local expressed its sentiments about the Plaintiff's role in amending the insurance provisions of the 1978 Anthracite Wage Agreement. The Plaintiff was labelled a "widow robber" by the local because he participated in amending the insurance provisions of the agreement to provide that, after a month off the job due to illness or injury, a miner would no longer be eligible for the insurance benefits. There was no time limit specified in the original agreement. The local interpreted the amendment as a restriction on the eligibility for benefits originally provided by the agreement. They labelled the plaintiff as a "widow robber" because, ac-

cording to their interpretation, if a miner was injured on the job and died after having been off the job for more than a month, his widow would receive no life insurance benefits.

In subsequent editorials, O'Brien made use of the phrase "widow robber" when discussing the Plaintiff. In each article, he pointed out the origin of the phrase. The Plaintiff argues that the use of the phrase is libelous. The Defendants argue that the use of the phrase was no more than rhetorical hyperbole and, therefore, cannot form the basis for a libel action.

Based upon the holdings in *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), and *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), we find that the use of the phrase "widow robber" was merely "rhetorical hyperbole, a vigorous epithet" used by those who considered the Plaintiff's role in amending the 1978 Anthracite Wage Agreement as extremely unreasonable. It is very difficult to believe that any reader of the newspaper would have understood the Defendants to be charging the Plaintiff with the crime of robbery. The use of the phrase was not libel.

Slip Op., Rubright, J., 12/14/88, pp. 5–6.

We therefore affirm the Order granting summary judgment on this issue.

Order of summary judgment affirmed as to the "widow robber" issue and reversed and remanded for trial on the helicopter conveyance issue.

Jurisdiction relinquished.

KELLY, Judge, concurring:

I concur in the result. The characterization of appellant as a "widow robber" was a derogatory rhetorical hyperbole; it was also an opinion based upon disclosed facts. As such it was not actionable. *See Dougherty v. Boyertown Times,*

377 Pa.Super. 462, 476–80, 547 A.2d 778, 785–86 (1988). While I do not find a "hot news" exception embraced in *Curran v. Philadelphia Newspapers*, 376 Pa.Super. 508, 546 A.2d 639 (1988). I likewise agree with the majority that whether or not such an exception might be recognized in an appropriate case it could not reasonably apply here. I further agree wholeheartedly that there appears a genuine issue of fact from which a jury could reasonably find actual malice with regard to the patently defamatory helicopter report.[1]

1. The assertions by the reporter and the publisher that they did not understand the import of a report that an incumbent mining union official was being transported by coal company helicopter for campaign appearance is specious. It does nothing to advance their legal position, though it does much to undermine their general credibility.