## Godwin v. Daily Local News Company

*Jeffrey A. Mahle,* for plaintiff.
*William H. Mitman Jr.,* for defendant.

GAWTHROP, *J.,* November 19, 1987 — Before us is a motion for post-trial relief on behalf of the Daily Local News Company, defendant in this libel action. The *Local News* seeks relief from a jury verdict returned in favor of plaintiff, James A. Godwin, a former Pennsylvania State Trooper, in the amount of $89,000 in compensatory damages, and $100,000 in punitive damages. The *Local News* requests the entry of judgment notwithstanding the verdict, a new trial, and a remittitur.

## FACTS

On Saturday, March 27, 1982, the *Local News* carried an article by its reporter, Bill Mooney, which read as follows:

### CONVICT'S LAW SUIT CHARGES STATE POLICE WITH STEALING
by Bill Mooney
(Of the Local News Staff)

"A former Philadelphia police officer convicted of theft sued the state police at Embreeville yesterday for $500,000 and accused one trooper of stealing his personal property while executing a search warrant.

"John Allen Goodman, 34, of Lorry Place, Phila., who described himself yesterday as an 11-year police veteran and medal of valor recipient, sued the state police and Tpr. James A. Godwin of the Embreeville barracks. In his suit Goodman claims Godwin stole personal belongings of Goodman's

while executing a search warrant at 8 p.m. last January 7 at Goodman's home.

"Cpt. William Hairston, the officer in charge at the Embreeville barracks, told the *Daily Local News* this morning that 'I have no information (on) what you're talking about.'

"In addition to filing this civil action yesterday in Chester County Court, Goodman has also brought a private criminal complaint through Honey Brook District Justice Susann Welsh's office, and he said the Chester County District Attorney's office is investigating the complaint.

"Goodman said the complaint, filed Wednesday, included charges of theft by deception, criminal conspiracy, falsification of official documents, and securing an illegal search warrant. He stated that the complaint was being investigated by assistant district attorney John Crane.

"Chester County District Attorney James Freeman said this morning that 'I know nothing about the case.' He added, however, that Crane could have received it and not brought it to his attention.

" 'If this individual (Goodman) is pursuing a private complaint it will be handled as other criminal complaints and he will be asked to come to our office to substantiate that a crime occurred and that it occurred in Chester County,' Freeman explained. 'It is not our policy as a matter of course to investigate all private complaints. Private complaints occur when the police entity responsible for the area in which the crime occurred did not prefer charges.' "

"Goodman, who is also known by the aliases of Robert B. Chase and John Kinikin, was sentenced last February to serve three-to-23 months in Chester County Prison for theft by deception and conspiracy in a case in which the Elverson National

Bank was defrauded of $20,000."

### "Shot by robber"

"Goodman is currently at the Bryn Mawr Rehabilitation Center recovering from a mild heart attack. He said his right leg was amputated from the knee down in January; he had been shot in the leg by a robber on Christmas Eve, 1976, while in the line of duty, and he said he retired from the force that year.

"In the suit, Goodman accused Godwin of stealing, among other things, $1,651 in cash from the top dresser drawer in his master bedroom; an 18-carat gold $6,200 watch from inside a briefcase that was inside his car; and personal mail from his mailbox.

"Goodman claims Godwin took these personal items while executing a search warrant that had been issued for the express purpose of seizing anything in the house which would help establish the identities of Goodman and his wife, items such as personal checks, bills or certificates.

"According to both the civil pleadings Goodman filed and the photostat of the search warrant inventory which he included in the suit, the police also seized the following on January 7 from Goodman's home; a 22-caliber semi-automatic rifle; a .45-caliber semi-automatic pistol; a Winchester 12-gauge shotgun; a .357-caliber revolver with holster; handcuffs and handcuff keys; a U.S. post office key; four Nevada license plates; a 1976 food truck and a 1978 van which contained over $4,000 in food for Goodman's lunch truck business; and Goodman's 1981 Pontiac Firebird."

### "Alleges incomplete list"

"Goodman claims the inventory police prepared after searching his home doesn't indicate that the cash, mobile telephone or the mobile radio were seized. Nevertheless, Goodman claims they were

seized and that the police haven't responded to his requests for their return. 'They had nothing to do with the case,' he said of the seized items.

"In addition, Goodman claims in the suit that Godwin took from the food trucks 20 cigarette cartons, boxes of candy and mixed food, 40 cartons of mixed soda and things like cups and dishes.

"Goodman said last night he feels that Godwin 'has a personal vendetta against me,' apparently because Goodman is a former police officer who committed a crime. Goodman said he committed his crimes because of money.

" 'I had a need for money. Money was tight,' he said, even though he worked his lunch truck business in the vicinity of 34th and Spruce Streets at the University of Pennsylvania campus in Philadelphia.

"As a result of his plea bargain, he said he signed over his trucks to the commonwealth toward restitution. His wife, Rhondda E. Goodman, who also is known as Rhondda E. Kinikin, received a year's probation for conspiracy, he said.

"Goodman claims in the suit that Godwin entered the home about 8 p.m. January 7 but that the search warrant didn't give him permission to seize mail or anything from the food trucks. Goodman said the police won't give him a full inventory of what was seized.

"His suit requests that the police return everything they took or that they pay full market price for every item and that the defendants additionally pay him $500,000.

"Goodman was arrested in Philadelphia last December 15 and police charged him with the theft of about $20,000 from the Elverson National Bank using checks stolen from another state. The thefts occurred last October and November, police reported."

The truth of the matter, however, was that Goodman, a convicted felon, had never served in the Philadelphia Police force, and his allegations of illegality by Trooper Godwin were baseless. No criminal complaint had been filed, and Godwin had never been under any investigation by the Chester County District Attorney's Office.

The background to this report is as follows: on Friday, March 26, 1982, Goodman called the *Local News* and was put in touch with Mooney. Goodman recited his various allegations and claimed to have filed both a civil and a criminal complaint against Godwin. Mooney went to the Chester County Prothonotary's Office where he read Goodman's civil complaint. In the complaint, Goodman and his wife brought action against Godwin and the Pennsylvania State Police, alleging, in essence, that on January 17, 1982, Godwin had conducted an illegal search and seizure of their premises and that the property was in the custody of Godwin and/or the Pennsylvania State Police. The complaint also contained information that should have alerted the reporter to the following facts: (1) Goodman had at least three aliases; (2) Goodman was under arrest for bank fraud; (3) Goodman and his wife had been arrested by Trooper Godwin; (4) Goodman had been in prison since 1981; and (5) among the items seized during the search were numerous weapons, including a semi-automatic rifle, a shotgun, a pistol, and a revolver, as well as a U.S. Post Office key, handcuffs, and handcuff keys. Attached to the complaint was a return of the search warrant which made evident that Godwin and conducted the search in the presence of at least two other officers.[1]

---

1. At trial, Mooney testified that he reviewed the return of the search warrant before his second contact with Goodman.

That afternoon, Mooney contacted the Philadelphia Police, but was informed that no information concerning Goodman's claim to have been on the police force could be obtained until the following Monday. Mooney then conducted a second telephone interview with Goodman, who repeated his charges. In the course of the conversation, Goodman acknowledged committing theft-related crimes for which he was being incarcerated.

Mooney subsequently called the office of Honey Brook District Justice Susann Welsh, who, he asserts, was not available. Mooney apparently made no effort to substantiate Goodman's claims with anyone else in her office.[2] Mooney also called the Chester County District Attorney's Office, but was unable to find Assistant District Attorney John Crane. Crane later testified at trial that he could have been reached at home the evening of March 26, 1982, and the following morning. At the time of the incident, Crane's phone number was not unlisted, but rather, listed next to his name in the West Chester Telephone Director. Finally, Mooney contacted the Pennsylvnaia State Police but was unable to obtain any information. At no time did Mooney attempt to contract Godwin or the other police officers named in the warrant for return of service.

On the basis of this investigation, Mooney wrote a draft of the article, but left with it a caveat: when he had finished, he left a note on Managing Editor Robert Showmaker's desk for someone to "check

---

2. At the time of his deposition, Mooney stated that he did not ask anyone in the District Justice's office whether criminal charges had been filed. At the trial, Mooney initially asserted that he had inquired as to the filing of the criminal charges, but retracted his testimony when plaintiff's attorney pointed out the discrepancy with his earlier testimony.

out this additional information."[3]

The next morning, Editor Shoemaker instructed a reporter, Florence Miller, to call the Philadelphia Police and the Pennsylvania State Police, Embreeville Barracks. The Philadelphia Police told her that no information could be provide until Monday. The Pennsylvania State Police likewise had no information. Ms. Miller did reach District Attorney James R. Freeman, who explained that he was unfamiliar with the case. At the trial, Ms. Miller said she was unable to recall whether she attempted to call Assistant District Attorney Crane or District Justice Welsh. In any event, there is no evidence that she did.

Editor Shoemaker incorporated the information which Miller gathered into the story in paragraphs three, six, and seven of the articles, wrote the headline, and sent the article to press.

On Monday, March 29, Mooney contacted the Philadelphia Police, who informed him that they had no record of Goodman's ever having been a police officer. He also received a call from Godwin's attorney, who explained that Goodman had never been a policeman, that no criminal charges had been filed, and that there was no ongoing investigation by the district attorney's office. On the basis of this information, Mooney wrote a second article published that same day by the *Local News,* headlined "Doubt Cast on Story of Man Suing Police."[4]

---

3. On May 6, 1986, this court granted Mooney's motion for compulsory non-suit on the basis that his note to his superiors, requesting addtional verification, absolved him of liability.

4. The story reported that "[t]he man who sued the State Police last week claiming they illegally possessed his personal property stuck by his story this morning even though informa-

On Thursday, April 1, 1982, Mooney wrote a final article on the matter, headlined "Suit Against State Trooper is Dropped." The article reported that Goodman had dropped his civil suit against Trooper Godwin after having been deposed by Godwin's lawyer; that Goodman had never been a police officer; and that he had a "criminal record stretching back several years."

## DISCUSSION

### Defendant's Motion for Judgment Non Obstante Veredicto

The *Local News* asserts that it is entitled to a judgment non obstante veredicto (judgment n.o.v.) on the bases that: (1) there is no evidence of "actual malice" on its part; and (2) the article of March 27, 1982, consists substantially of an accurate report of judicial proceedings and is, therefore, privileged.

We may enter a judgment n.o.v. only in a clear case after the evidence had been evaluated in light of the verdict winner, with any doubts to be resolved in favor of preserving the verdict. *Atkins v. Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 414 A.2d 100 (1980); *Cohen v. Blank*, 359 Pa. Super. 93, 518 A.2d 582 (1986). An entry of judgment n.o.v. is proper only where the facts are such

---

tion from the Philadelphia police has cast doubt on his credibility." The article went on to say that the Philadelphia police had nothing in their personnel files to indicate that Goodman was ever an officer and that there were reports that Goodman was awaiting possible extradition to California on a fugitive from justice warrant. The article reiterated Goodman's allegations against Godwin would be investigated by Embreeville Lt. James Amos. The article concluded by stating that Goodman intended to pursue a private criminal complaint, while noting that District Justice Welsh had indicated that nothing had been filed in her office.

that no two reasonable minds could fail to agree that the verdict is improper. *Olson v. Dietz,* 347 Pa. Super. 1, 500 A.2d 125 (1985).

### Privilege to Report Judicial Proceedings

The first issue before us is whether the substance of the article of March 27, 1982, falls under the common law privilege to report judicial proceeding.[5] The basis for this privilege rests upon the idea that "It is better that an individual be harmed than that the public go uninformed about the public business. . . ." *Biggans v. Foglietta,* 403 Pa. 510, 511, 170 A.2d 345, 346 (1961).

This privilege, however, is a qualified one and will be forfeited where the plaintiff[6] establishes that the report did not contain a "summary of substantial accuracy." *Sprague v. Walters,* 357 Pa. Super. 570, 516 A.2d 706 (1986); Restatement (second) Torts §611. False additions, to, or embellishments of, the privileged material will vitiate the privilege. *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963); Restatement (Second) Torts §611, comment f. See also, *Boyer v. Pittsburgh Publishing Co.,* 324 Pa. 154, 188 Atl. 203 (1936) (privilege is lost when privileged report is accompanied by unfair and unwarranted comment.)

---

5. Plaintiff argues that no privileges attached to the Local News's report of Goodman's civil complaint because no judicial action had been taken. We cannot agree. In Pennsylvania, reports of readings are privileged even in the absence of official action by the courts. See *Pittock v. O'Niell,* 63 Pa. 253 (1869); *Mengel v. Reading Eagle Co.,* 241 Pa. 367, 88 Atl. 660 (1913); *Wachs v. Ramp Consulting Services Inc.,* 28 D.&.C. 2d 201 (1961). But see, *Hanish v. Westinghouse Broadcasting Co.,* 487 F. Supp. 397 (E.D. Pa. 1980).

6. Under Pennsylvania law, a plaintiff has the burden of proving abuse of privilege. 42 Pa. C.S. §8343(a)(7).

Whether a report is substantially fair and accurate is a question for the jury.[7] *Williams v. WCAU-TV,* 555 F.Supp. 198, 201 (E.D. Pa. 1983). We find that there was a genuine issue of material fact as to whether the *Local News* abused its "fair report" privilege, and there was sufficient evidence for the jury to conclude that an abuse had occurred. The newspaper article of March 27, 1982, contained numerous falsities in addition to those contained in the civil complaint. In particular, it reported that Goodman was "a former Philadelphia police officer" and "an 11-year police veteran and medal of valor recipient" who had been shot in the leg by a robber . . ."; that Trooper Godwin had a personal vendetta against Goodman; that a private criminal complaint had been filed against Godwin, alleging "theft by deception, criminal conspiracy, falsification of official documents, and securing an illegal search warrant. . . ."; and, most importantly, that Godwin was under criminal investigation by the Chester County District Attorney's Office. This information came not from the privileged civil complaint, but from the unprivileged, *dehors*-the-courthouse mouth of Goodman. These statements[8] as mere additions to

---

7. In its motion for new trial, the defendant argues that this court erred in submitting the question of abuse of privilege to the jury. We conclude otherwise, since the evidence adduced did not inexorably lead to but one conclusion. See *Sciandra v. Lynett,* supra, 409 Pa. at 606, 187 A. 2d at 592.

8. Defendant argues that these allegations, contained outside the complaint, cannot be considered defamatory. We disagree. A publication is defamatory if it "tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injure him in his business or profession." *Cosgrove Studio and Camera Shop Inc. v. Pane,* 408 Pa. 314, 317, 182 A. 2d 751, 753 (1962). The assertions that a private criminal complaint had been lodged and that Trooper Godwin was under criminal investigation falsely impute that Trooper Godwin

or embellishments of the charges contained in the complaint, were such as to permit a jury to conclude that the article's contents went beyond a fair and accurate account of official proceedings and vitiated the newspaper's privilege.[9]

## Evidence of "Actual Malice"

The next issue we must decide is whether the plaintiff in this libel action presented sufficient facts for the jury to infer that defendant publisher acted with "actual malice."

Libel plaintiffs who are public officials[10] must prove both falsity and "actual malice" in order to re-

had committed a crime. False imputations of criminal activity clearly can damage a person's reputation of standing in the community. *Brophy v. Philadelphia Newspapers Inc.,* 281 Pa. Super. 588, 594, 422 A. 2d 625, 628 (1980). See also *Marcone v. Penthouse International Magazine for Men,* 754 F. 2d 1072, 1078 (3d Cir. 1985)(statements imputing·the commission of an indictable offense are capable of defamatory meaning as a matter.of law.) We therefore conclude that the statements were capable of a defamatory meaning, and that the jury was entitled to conclude that they were indeed defamatory. See *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A. 2d 899, 904 (1971).

9. We further note that the jury could also have concluded that the story did not fairly and accurately report upon the contents of the complaint in that it omitted Goodman's allegation that he and his wife had been arrested by Godwin; that the items seized were in the hands of Godwin and the State Police; and the fact that the search had taken place in the company of at least two other officers.

10. Policeman have been consistently treated as public officials within the context of defamation actions. See *Coughlin v. Westinghouse Broadcasting and Cable,* 603 F. Supp. 377, 385-86 (E.D. Pa. 1985), affirmed 780 F. 2d 340, cert. denied 467 U.S. 1187, 106 S. Ct. 2927, 91 L. Ed. 554 (1986).

cover against media defendants. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). "Actual malice" will be found "only on clear and convincing proof that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for the truth." *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 342, 94 S. Ct. 2997, 3008, 41 L. Ed. 2d 789, 807 (1974).

It is not sufficient to prove that the publisher did not act as a reasonable, prudent publisher should; rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262, 267 (1968).

Although the standard is a subjective one, circumstantial evidence may be relied upon by the plaintiff to establish that the publisher acted with actual malice. *Herbert v. Lando,* 441 U.S. 153, 160, 99 S. Ct. 1635, 1640-41, 60 L. Ed. 2d 115, 124 (1979); *Ariel Sharon v. Time Inc.,* 599 F. Supp. 538, 564 (S.D. N.Y. 1984); *Vandenburg v. Newsweek Inc.,* 507 F.2d 1024 (5th Cir. 1975). While the mere failure of a publisher thoroughly to investigate is, by itself, insufficient in this regard, *St. Amant v. Thompson,* supra, 390 U.S. at 733, 88 S. Ct. at 1326, 20 L. Ed. 2d at 268, actual malice may, nevertheless, be inferred by an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 158, 87 S. Ct. 1975, 1993, 18 L. Ed. 2d 1094 (1967), modified on other grounds, 497 Pa. 163, 439 A.2d 652 (1982). See also, *Frisk v. News Co.,* 361 Pa. Super. 536, 523 A.2d 347 (1986) (serious doubts as to truth of publication established by "clear departures from accept-

able journalistic procedures."[11])

Similarly, actual malice may be demonstrated where "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson,* supra, 390 U.S. at 732, 88 S. Ct. at 1326, 20 L. Ed. 2d at 268; *Herbert v. Lando,* supra, 441 U.S. at 156-57, 99 S. Ct. at 1639, 60 L. Ed. at 122; *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971); *Marcone v. Penthouse International Magazine for Men,* 754 F. 2d 1072, 1089 (3rd Cir. 1985), cert denied, 474 U.S. 864, 106 S. Ct. 182, 87 L. Ed. 2d 151 (1985). See also, *Curtis Publishing Co. v. Butts,* supra, (actual malice shown where informant had been placed on probation with bad check charges, and magazine published story without "substantial independent support.")

The *Local News* suggests that there is no evidence in the case sub judice from which the jury could infer that the publisher acted with actual malice. It argues that, at most, it was guilty of failing to investigate fully. We disagree. What we have before

---

11. In its motion for new trial, defendant makes the argument that the "journalistic standards" criteria enunciated in *Curtis Publishing Co. v. Butts,* supra, is limited to cases involving a "public figure" and that this court, therefore, erred in defining actual malice as "an extreme departure from proper reporting standards" in its charge to the jury. (N.T. 5/6/86, 126). We disagree. Pennsylvania courts have consistently applied the *Butts* holding in libel cases involving public officials, including police officers. See, e.g., *Dunlap v. Philadelphia Newspapers Inc.,* 301 Pa. Super. 475, 488 A. 2d 6 (1982) (libel action brought by sergeant of police department); *Brophy v. Philadelphia Newspapers Inc.,* 281 Pa. Super. 588, 422 A. 2d 625 (1980) (police commissioner and police officers). We further note that in paragraph 34 of its answer, the defendant stated that "[t]he plaintiff is a 'public figure' or a public official as a matter of law." (emphasis supplied)

us is "more than a simple failure to investigate. The allegations involved were clearly serious enough to warrant some attempt at substantiation . . . [the defendants'] failure to investigate where they had such obvious reasons to doubt [the informant's] . . . veracity and the accuracy of his allegations manifests a reckless disregard for the truth." *Stickney v. Chester County Communications Ltd.,* 361 Pa. Super. 166, 172, 522 A.2d 66, 69 (1987). The actions of the defendant in speedily publishing such serious accusations from such an unreliable source[12] without any meaningful attempt at substantiation provided the jury with sufficient evidence from which they could infer that the publisher was motivated by actual malice.

We further note that in reaching their conclusion, the jury was free to accept the testimony of the plaintiff's expert witness[13] who opined that the defendant's actions constituted a serious breach of journalistic standards,and to draw reasonable inferences regarding the defendant's motives from the expert's testimony. Determinations of credibility, the weighing of the evidence, and the drawing of legitimate inferences from the facts are within the province of the jury. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 2513, 91 L.Ed. 2d 202, 216 (1986).

Finally, we should add that the jury's finding of actual malice may be supported by the failure of the

---

12. In his deposition testimony, Mooney, who, at the time in question, was, of course, the agent of the defendant, *Local News*, acting within the scope of his employment, testified that he actually doubted Goodman's veracity, at least regarding the filing of the private criminal complaint.

13. Professor Paul Sullivan, Chairman of the Department of Journalism at Temple University.

*Local News* to issue at any time a formal retraction of Goodman's allegations.[14] Refusal to retract an exposed error tends to support a finding of actual malice. *Zerangue v. TSP Newspapers Inc.*, 814 F. 2d 1066, 1071 (5th Cir. 1987).

Accordingly, for the foregoing reasons, we find sufficient factual basis on this record, and in consideration of the applicable law, to support the verdict of the jury.

## Defendant's Allegations of Error

The *Local News* also asserts numerous grounds upon which it claims a new trial should be granted. In ruling on the defendant's motion for new trial, we are mindful that we may only rule on issues which have been the subjects of timely objections at trial. *Dilliaplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974), and have been specifically preserved in post-trial motions. The post-trial mo-

---

14. The *Local News* strenuously asserts in its motion for new trial that this court erred in permitting the plaintiff's expert witness to testify that its follow-up articles did not succeed in "retracting" the original article, thereby implying that a retraction occurred through its subsequent publications of March 29 1982, and April 1, 1982. Black's Law Dictionary, (5th Ed. 1979), defines a retraction, in relevant part, as "a formal recanting of the defamatory material." It has been stated in this regard that a retraction "can be effected only if it is a full and unequivocal one that does not contain lurking insinuations or hesitant withdrawals. It must, in short, be an honest endeave to repair all the wrong done by the defamatory imputation." *Brogan v. Daily News*, 22 N.J. 139, 132 A.2d 473, 477 (1956). As none of the subsequent articles purported to offer a formal recantation of the false information contained in the March 27 article, we see no error in permitting the expert to opine that the follow-up articles did not constitute a retraction, and we thus find ample basis for the jury's having apparently concluded that no such retraction had occurred.

tion must set forth the theories and the supporting reasoning therefor so that we will know what the moving party is asking us to decide. See *Frank v. Peckich,* 257 Pa. Super. 561, 391 A.2d 624 (1978). Issues which are not raised in post-trial motions are waived, *Benson v. Penn Central Transportation Co.,* 463 Pa. 37, 342 A.2d 393 (1975), and those raised, but not briefed so as to set forth the grounds for relief, are deemed to have been abandoned. *Artley v. Champion,* 33 Lack. Jur. 171 (1932). We will address only those alleged errors which the *Local News* properly preserved for post-trial consideration.

## Instructions Concerning Constitutional Malice

The *Local News* asserts that the court incorrectly defined actual malice, or constitutional malice, in its charge to the jury.[15] First, the *Local News* contends that the court improperly substituted the "reasonable care" standard in place of the "actual malice" standard. Toward the end of the initial 166-page charge, the court considered the defense counsel's objections, accepted them, and re-charged on this point along the lines suggested by counsel.

After the corrective charge, the court gave counsel the opportunity to take additional exceptions. Defense counsel failed to object to the corrective charge and therey waived its opportunity to argue the issue post-trial. *DiSerafino v. Bucyrus-Erie Corp.,* 323 Pa. Super. 247, 470 A.2d 574 (1983). Likewise, defendant has waived the issue of this court's definition of recklessnes, owing to its failure to raise the issue at trial. *Dilliplaine,* supra.[16]

---

15. See note 11, supra.

16. Similarly, we cannot entertain defendant's argument that this court erred in instructing the jury to assess "the nature of the interests which defendant was seeking to promote

Defendant also argues that this court erred in instructing the jury that it "must determine whether the publication was made in good faith, but professions of good faith will unlikely be persuasive where based, for example, wholly on an unverified telephone call. I'm not saying that this was unverified, but that's for you to consider." The good faith test, as stated by this court, is taken almost verbatim from the language of the Supreme Court in *St. Amant v. Thompson,* supra, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed. 2d at 267-268, and we cannot quite understand counsel's problem with it. Contrary to defendant's assertion, the court never suggested that Goodman's call to Mooney was unverified, but merely made clear that the jury, of course, is the final arbiter of facts.

## Plaintiff's Expert Witness Testimony

The *Local News* next asserts that the court erred in permitting plaintiff's expert witness[17] to testify that the newspaper's conduct constituted a "breach or a departure from standards normally adhered to by responsible publishers." The decision to admit expert testimony is within the discretion of the trial court. *Dambacher v. Mallis,* supra. See also, *Commonwealth v. Roth,* 366 Pa. Super. 575, 531 A.2d

by publishing the article or articles," because no exception was taken to this portion of the charge. We are also precluded from addressing the issue of whether this court erred by instructing the jury that a "headline itself may be defamatory when read in the context of the article over which it is placed," because defendant failed to object to this point and has not preserved the issue in its post-trial motion.

17. Defendant does not question the fact that the witness was qualified to be an expert. See *Rutter v. Northeastern Beaver County School District,* 496 Pa. 590, 437 A.2d 1198 (1981).

1133 (1987), (trial court has broad discretion in admitting evidence). Such testimony is proper "only where formation of an opinion on a subject requires knowledge, information, or skill beyond what is possessed by the ordinary juror." *Commonwealth v. Seese*,[18] 512 Pa. 439, 442, 517 A.2d 920, 921 (1986). See generally, Packel and Poulin, Pennsylvania Evidence (1987), §702.1.

This issue of whether a plaintiff may present expert testimony to prove actual malice in a libel action appears to be one of first impression within this commonwealth. In the absence of any Pennsylvania cases directly on point, we will adopt the reasoning of the Supreme Court of our sister state of New Jersey in *Sisler v. Garnett Co. Inc.*, 104 N.J. 256, 516 A.2d 1083 (1986). In that case, the Supreme Court of New Jersey declared that "[e]xpert testimony would be appropriate in those defamation cases when the litigation focuses on issues beyond the experience and comprehension of the average person . . . [E]xpert testimony regarding journalistic practices and customs may properly inform a jury, even when the burden of proof is actual malice." 516 A.2d at 1095. (citation omitted) We also find *News Publishing Co. v. DeBerry*, 171 Ga. App. 787, 321 S.E. 2d 112 (1984), cert. denied, 471 U.S. 1053, 105 S. Ct. 2112, 85 L.Ed. 477 (1985), to be persuasive. In that case, in which a warden sued a newspaper for libel, the Supreme Court of Georgia held that the trial court did not invade the province of the jury in admitting expert testimony as to recognized journalistic standards. The court noted that the ex-

18. As Chief Justice Agnew noted in *Brown v. Schock,* 77 Pa. 471, 477 (1875): "The rules of evidence are the same in criminal and civil cases when they pertain to questions which must be the same in their nature."

pert witness testified solely as to certain generally recognized standards in journalism and never ventured to opine whether the conduct described to him constituted actual malice. The expert testimony at bar was similarly circumscribed.

Similarly, the Restatement (Second) of Torts §580B, comment g, states, in relevant part, that "[e]vidence of custom within the profession of news dissemination would normally come from an expert who has been shown to be qualified on the subject. It may be testimony that the course of conduct followed by the defendant was or was not in accordance with recognized professional practices."

We conclude, therefore, that where a severe departure from journalistic standards is alleged in a libel action, it is altogether proper to admit expert testimony on the issue, provided that the expert does not go beyond the confines of journalistic practice to the realm of whether the defendant's conduct in fact constituted "actual malice."[19] Such being the case at bar, there is no error in this regard.

## The Issue of "Hot News"

Defendant contends that it was error to permit the expert witness to testify that the report of Goodman's having filed a civil complaint was not "hot news," and consequently could have been more thoroughly investigated. It also contends that this court erred in instructing the jury that "where the material published does not involve an element of so-called news . . . . reckless conduct may be

---

19. We further note that in the case sub judice, the expert testimony was appropriate in that it refuted the opinion evidence, elicited by the defense, from its senior editor, that the story was "sound" and "newsworthy."

evidenced in part by the failure to investigate thoroughly and verify the facts contained therein. . . ."

Defendant initially takes the peculiar position that the "hot news" doctrine has only been applied in past cases as a means of exonerating defendant publisher by allowing a lower investigative process in cases where there is an urgent need to publish. This argument, of course, ignores the seminal case of *Curtis Publishing Co. v. Butts,* supra, and *Corabi v. Curtis Publishing Co.,* supra, wherein both the United States and the Pennsylvania Supreme Courts found that liability attached to publishers in instances where the reports were not "hot news."[20]

Defendant also makes the argument, citing *Coughlin v. Westinghouse Broadcasting & Cable Inc.,* supra, and *Dickey v. C.B.S. Inc.,* 583 F.2d 1221 (3d Cir. 1978), that the question of whether a story is "hot news" has no bearing on the issue of actual malice. We note initially that we are bound only by Pennsylvania state law and the law of the United States Supreme Court; decisions of federal courts have only persuasive value. See *Cianfrani v. Johns-Mansville Corp.,* 334 Pa. Super. 1, 482 A.2d 1049 (1984); *North Penn Consumer Discount Co. v. Shultz,* 250 Pa. Super. 530, 378 A.2d 1275 (1977). Inasmuch as the "hot news" doctrine, as we stated it before the jury, derives from the United States

---

20. Defendant also takes exception to the "notion" that the article in question, reporting that a felon had filed a lawsuit against a police officer which alleged events that had taken place close to four months prior to the complaint, is not in the category of "hot news." Under the circumstances as we have outlined them, this court is hard pressed to understand how this would constitute a "hot news" item. However, the question of whether there were circumstances requiring immediate dissemination of such knowledge were facts for the jury, not this court, to decide.

Supreme Court and has been accepted in Pennsylvania by our Supreme Court, supra, 261 Pa. Super. at 135-36, 395 A.2d at 1351, we are constrained by these binding precedents from holding otherwise.

Hence, the "hot news" testimony was not error, but was proper.

## The Standard for Proving Falsity

The *Local News* asserts that this court erred when it charged the jury that "plaintiff must prove to you by a fair preponderance of the evidence that the allegedly defamatory statements contained in the articles were false." We note initially that the burden of proving both falsity and actual malice is on plaintiff. *Philadelphia Newspapers Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Plaintiff must prove actual malice by "clear and convincing proof." *Gertz v. Robert Welch Inc.,* supra, 418 U.S. at 342, 94 S.Ct. 2997. In *Hepps,* the United States Supreme Court refrained from deciding whether this standard of proof was also applicable to plaintiffs' burden of proving falsity. 475 U.S. at 779, 106 S.Ct. at 1556, 89 L.Ed.2d at 794. It observed that "[a]s a practical matter . . . evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements will generally encompass evidence of the falsity of the matters asserted." 475 U.S. at 778, 106 S.Ct. at 1565, 89 L.Ed.2d at 794.

In the absence of any authority holding that a "clear and convicing" standard of proof is required where a public official seeks to prove falsity, we find no error in this court's having instructed the jury that falsity could be established through a "fair preponderance of the evidence." In any event, we seriously doubt that the result in this case would have been different had a higher standard been applied.

The *Local News* admitted in its answer to plaintiff's complaint that Godwin was "not guilty of the crimes referred to in paragraph 11 hereof . . . It is admitted that no charges were brought against [Godwin] . . ." It also stated that it did not know that Goodman's statements were false. Further, in its motion for summary judgment, it stated that:

"[i]t is clear that certain statements contained in the initial article pertaining to Mr. Goodman (i.e., has alleged status as a former Philadelphia police officer) were not true. The defendants further admit that the report contained in the article to the effect that Goodman filed a private criminal complaint against the plaintiff in the office of District Justice Susann Welch charging theft and related offenses was not true, and that, in fact, such a private criminal complaint was never filed."

It is well settled that a party is bound by factual admissions in his pleadings. See *Martin v. Poole,* 232 Pa. Super. 263; 336 A.2d 363 (1975). Furthermore, at the trial., Mooney conceded that no criminal charges had been filed by Trooper Godwin against Goodman and that there had been no criminal investigation. This was corroborated by the testimony of Assistant District Attorney Crane, and District Justice Susann Welsh. Under these circumstances, we believe that even if the "clear and convincing" standard were to apply, plaintiff would have easily satisfied his burden. Defendant admitted the falsity.

## Defendant's Motion for Remittitur

The *Local News* finally argues that the jury's verdict was excessive and not supported by the evidence. We note that a jury's verdict as to damages must stand unless the verdict is "so grossly excessive so as to shock our sense of justice." *Ecksel v.*

*Orleans Construction Co.*, 360 Pa. Super. 119, 134, 519 A.2d 1021, 1028 (1987).

The *Local News* contends that the jury's award of compensatory damages was in error because Trooper Godwin never established damage to his reputation. We note initially that since we have concluded that the plaintiff met his burden of proving actual malice, it was not necessary for him to show actual injury to his reputation. See *Gertz v. Robert Welch Inc.*, supra, 418 U.S. at 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. As such, it was entirely proper for the court to instruct the jury that it could presume damages for the plaintiff. *Frisk v. News Co.*, supra, (compensatory damages may be presumed under *Gertz*). Moreover, we note that Trooper Godwin did present evidence of actual harm to his reputation, and, of course, the jury was at liberty to accept his evidence in reaching their verdict. Trooper Godwin testified that as a result of the article, his reputation was put into question, and he was forced to leave the State Police before his retirement vested. At the time of the trial, he testified that he was employed at Lukens Steel in a position that paid $2,000 per year less than his previous employment.

Finally, the *Local News* maintains that the court erred in permitting the jury to assess punitive damages against the defendant, contending, essentially, that punitive damages are impermissible under the First Amendment. This argument was recently rejected by the Superior Court in *Frisk v. News Co.*, supra, 361 Pa. Super. at 549, n. 4, 523 A.2d at 353, n. 4. See also, *Gertz v. Welch*, supra, 418 U.S. at 430, 94 S.Ct. at 3007, 41 L.Ed.2d at 805 ("Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues.")

Although defendant has not briefed the issue, we

also note that the punitive damages of $100,000 bore a reasonable relationship to the $89,000 award of compensatory damages. See *Kirkbride v. Lisbon Contractors Inc.*, 357 Pa. Super. 322, 516 A.2d 1 (1986). Furthermore, in determining the amount of the verdict for punitive damages, the jury could properly have taken into account plaintiff's evidence that the *Local News* had been sold for $36,000,000 some four months before the trial. Evidence of defendant's net worth is relevant to an assessment of punitive damages. See *Feld v. Merriam*, 314 Pa. Super. 414, 461 A.2d 225 (1983).

In conclusion, we recognize that "[t]he press is not obliged to satisfy the Platonic ideal of investigation. . . ." *Westmoreland v CBS Inc.*, 596 F.Supp. 1170, 1174 (S.D. N.Y. 1984).[21] Nevertheless, this does not give it carte blanche to violate basic journalistic tenets by publicizing false and damaging allegations from an informant whose veracity is clearly suspect, without any meaningful attempt to substantiate the charges.

## ORDER

Accordingly, for the foregoing reasons, defendant's motions for new trial and judgment non obstante veredicto shall be and hereby denied.

---

21. In our charge to the jury, we were careful to emphasize:

"[T]he people of this great nation . . . have ordained in light of history that in spite of excesses, abuses and falsehoods, the freedom of the press to publish is essential to this nation itself. It is also fundamental that erroneous statements and falsehoods are inevitable in a free press . . . and punishment of error runs the risk of inducing a cautious and restrictive exercise of the . . . constitutionally guaranteed freedoms of speech and press. . . . Thus, the First Amendment requires that we protect some falsehood in order that we may ultimately protect important free speech and communication."