546 A.2d 639

Robert E.J. CURRAN,

v.

PHILADELPHIA NEWSPAPERS, INC. doing business as the Philadelphia Inquirer, A Pennsylvania Corporation, Appellant,

Robert E.J. CURRAN, Appellant,

v.

PHILADELPHIA NEWSPAPERS, INC. doing business as the Philadelphia Inquirer, A Pennsylvania Corporation.

Superior Court of Pennsylvania.

Argued March 3, 1988.

Filed July 1, 1988.

Reargument Denied Aug. 29, 1988.

510

Samuel E. Klein, Philadelphia, for appellant (at 2426) and appellee (at 2532).

Garland D. Cherry, Sr., Media, for appellee (at 2426) and appellant (at 2532).

Before BROSKY, BECK and CERCONE, JJ.

CERCONE, Judge:

The action underlying this appeal is for defamation and is the result of an article published in *The Philadelphia Inquirer* (hereinafter *"Inquirer"*) on September 24, 1976. The Complaint was filed on October 4, 1976 by Robert E.J. Curran (hereinafter "Curran"), a former United States Attorney for the Eastern District of Pennsylvania, against Philadelphia Newspapers, Inc. (hereinafter "PNI"), publisher of the *Inquirer*.

After filing an answer to the complaint, PNI filed a motion for summary judgment which was granted by the trial court on March 29, 1977. On appeal by Curran to this Court, the grant of summary judgment was affirmed by an equally divided court. *Curran v. Philadelphia Newspapers, Inc.*, 261 Pa.Super. 118, 395 A.2d 1342 (1978) (hereinafter "Curran I"). Subsequently, on December 22, 1981, the Pennsylvania Supreme Court vacated the order granting summary judgment and remanded the case for further proceedings. *Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 439 A.2d 652 (1981) (hereinafter "Curran II").

The action proceeded to trial on September 10, 1984. On September 24, 1984, the jury returned a verdict against PNI in the amounts of $350,000.00 in compensatory damages and $450,000.00 in punitive damages. PNI filed a motion for post-trial relief, in the nature of judgment *non obstante verdicto* (hereinafter "judgment n.o.v."), which was denied. Judgment was entered on August 21, 1987. This appeal followed.[1]

1. Curran has filed a cross-appeal, at 02532 Philadelphia, 1987, requesting PNI's appeal at 02426 Philadelphia, 1987, be quashed. An order denying Curran's motion to quash has already issued from this court

In Pennsylvania, a cause of action for defamation may be brought under the Uniform Single Publication Act. 42 Pa.C.S.A. §§ 8341–8345. Among the elements which a plaintiff is required to establish are the defamatory character of the communication [2], its publication by the defendant, its application to the plaintiff, the understanding by the recipient of its defamatory meaning, the understanding by the recipient of it as intended to be applied to the plaintiff, special harm resulting to the plaintiff from its publication [3], and abuse of a conditionally privileged occasion. *Id.* § 8343.

■ An adjudication of a defamation case involves both state and federal law inquiries. A court must determine: "(1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and, if so, (2) whether the First Amendment [4] nevertheless precludes recovery." *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 269–70 (3d Cir.1980). When the plaintiff is a public official or figure [5], he or she sustains an additional burden of proving that the defendant acted with "actual malice". This requirement was established in the seminal case *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There the Supreme Court held:

and, therefore, we will not address any claim raised in Curran's cross-appeal.

2. According to Pennsylvania law, a statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971) (quoting *Cosgrove Studio & Camera Ship, Inc. v. Pane,* 408 Pa. 314, 318, 182 A.2d 751, 753 (1962)).

3. At the time the alleged defamation occurred, plaintiff was required to show special harm. However, during the course of trial, this court filed a new statement on the issue of damages. *See Agriss v. Roadway Express Inc.,* 334 Pa.Super. 295, 483 A.2d 456 (1984) adopting rule of Restatement (Second) of Torts § 569 (1977), that all libels are actionable without proof of special harm.

4. U.S. Const. amend. I.

5. Curran concedes that he was a public figure at the time of publication.

The constitutional guarantees [of freedom of speech and press] require ... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

376 U.S. at 279–80, 84 S.Ct. at 726. This protection extends to false statements of fact as well as comment or opinion. *Id.* "Actual malice" must be proven with "clear and convincing" evidence, *Bose Corporation v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984) (quoting *New York Times,* 376 U.S. at 285, 84 S.Ct. at 728), that the defendant realized that the statement was false or subjectively entertained serious doubt as to the truth of the statement. *New York Times,* 376 U.S. at 280, 84 S.Ct. at 710; *see also Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court explained the subjective nature of the "reckless disregard" standard as follows:

These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard to the truth or falsity which demonstrates actual malice.

390 U.S. at 731, 88 S.Ct. at 1325.

■■ The term "reckless disregard" is not amenable to one infallible definition. It is a term which is understood by considering a variety of factors in the context of an actual case. Such factors may be whether the author published a statement in the face of verifiable denials, *Brown & Williamson Tobacco Corporation v. Jacobson,* 827 F.2d 1119 (7th Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988), and without further investigation or

corroboration, where allegations were clearly serious enough to warrant some attempt at substantiation. *Stickney v. Chester County Communications, Ltd.,* 361 Pa.Super. 166, 522 A.2d 66 (1987). Likewise, evidence of unexplained distortion or the absence of any factual basis to support an accusation may be considered in determining whether the record is sufficient to support a finding of "actual malice". *Id.* *See also Frisk v. News Company,* 361 Pa.Super. 536, 523 A.2d 347 (1986) (clear departures from acceptable journalistic procedures, including the lack of adequate prepublication investigation; the use of wholly speculative accusations and accusatory inferences; and the failure to utilize or employ effective editorial review, were sufficient to support finding of reckless disregard for the falsity of the information). *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 158, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094 (1967).

■ However, ill will and a desire to do harm are not alone sufficient to show malice. *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965). Neither is falsity in and of itself sufficient to prove malice. *Curran I, supra; Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1091 (3d Cir.1985), *cert. denied,* 414 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985) ("Although lack of truthfulness of a statement is a prerequisite to liability in a libel action, mere falsity, without more, is generally not sufficient to establish actual malice."). Mr. Justice Harlan's opinion in *Curtis Publishing Co.,* 388 U.S. at 153, 87 S.Ct. at 1991, stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions.

In *St. Amant v. Thompson, supra,* the Court established a subjective standard for determining "actual malice" where it said:

Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient

evidence to permit the conclusion that *the defendant in fact entertained serious doubts as to the truth of his publication.*

390 U.S. at 731, 88 S.Ct. at 1325 (emphasis added).

In discussing this strict standard of proof, the courts have recognized that the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher and may in fact protect false publications. Nevertheless, the courts have responded:

But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not.

The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them into circulation. Likewise, recklessness may be found where there are obvious rea-

sons to doubt the veracity of the informant or the accuracy of his report.

*St. Amant,* 390 U.S. at 731–32, 88 S.Ct. at 1326 (footnote omitted).

■ Appellant PNI contends that the court erred in denying its motions for judgment n.o.v. or a new trial. The general standard of review in addressing these issues is well-settled. "A judgment notwithstanding the verdict should be entered only in a clear case, when the facts are such that no two reasonable persons could fail to agree that the verdict was improper; any doubts should be resolved in favor of the verdict winner." *Geyer v. Steinbronn,* 351 Pa.Super. 536, 549, 506 A.2d 901, 908 (1986) (citing cases). On appeal from the trial court's refusal of a motion for judgment n.o.v., "the sole duty of the appellate court is to decide whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner ... the benefit of every favorable inference reasonably to be drawn from the evidence." *Geyer,* 351 Pa.Super. at 549, 506 A.2d at 908.

When reviewing the record to determine whether plaintiff presented sufficient evidence to support the jury's finding of "actual malice", however,

[O]ur task is to make an independent examination of the evidence adduced to determine if it was constitutionally sufficient to warrant a finding by the jury of actual malice, and in so doing, the evidence, together with all reasonable inferences therefrom, must be considered in the light most favorable to the verdict winner, here the plaintiff. If it is not sufficient, [the defendant] is entitled to judgment n.o.v.

*Sprague v. Walter,* 357 Pa.Super. 570, 589–90, 516 A.2d 706, 716–17 (1986), *affirmed* 518 Pa. 425, 543 A.2d 1078 (1988) (quoting *Corabi v. Curtis Publishing Co.,* 441 Pa. at 458, 273 A.2d at 912) (footnote omitted). While this standard of appellate review was first espoused in *New York Times v. Sullivan, supra,* the rationale for an independent appellate review was fully set forth in *Bose Corporation v.*

*Consumers Union, supra.* In *Bose,* the Supreme Court explained that a finding of "actual malice" is not purely a finding of fact but, rather, it may be described as an "ultimate fact" which is a hybrid of evidential fact on the one hand and conclusion of law on the other. As the *Bose* court described it:

> A finding of fact in some cases is inseparable from the principles through which it was deduced. At some point, the reasoning by which a fact is "found" crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment. Where the line is drawn varies according to the nature of the substantive law at issue. Regarding certain largely factual questions in some areas of the law, the stakes—in terms of impact on future cases and future conduct—are too great to entrust them finally to the judgment of the trier of fact.

466 U.S. at 510–11, 104 S.Ct. at 1965. The court further exposited,

> The requirement of independent appellate review reiterated in *New York Times v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our commonlaw heritage. It reflects a deeply held conviction that judges—and particularly members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice".

*Id. See also* Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229 (1985).[6]

Application of the foregoing standard of review is more difficult than its recitation. There is considerable debate about what independent appellate review means. The District of Columbia Circuit in *Tavoulareas v. Piro,* 817 F.2d 762 (D.C.Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), recently summarized the two positions:

"Under one view, *Bose*'s mandate of *de novo* review means precisely that, with no deference at all to be accorded any jury finding germane to actual malice. Under the contrary view, *Bose* does not alter the traditional rules governing the review of jury verdicts and thus judicial deference is constitutionally mandated to presumed jury findings of underlying facts, evaluations of credibility, and the drawing of inferences."

817 F.2d at 776–77. We look to the *Bose* opinion to harmonize these conflicts:

Our standard of review must be faithful to both Rule 52(a) and the rule of independent review applied in *New York Times Co. v. Sullivan.* The conflict between the two rules is in some respects more apparent than real. The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; Rule 52(a) never forbids such an examination, and indeed our seminal decision on the Rule expressly contemplated a review of the entire record, stating that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court, *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed."

**6.** Independent appellate review has been exercised in other constitutional reviews with First Amendment implications such as determining whether particular remarks were so inflammatory as to come within the class of "fighting words," *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), and whether advocacy is directed to inciting cr producing imminent lawless action, *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam).

*Bose Corporation,* 466 U.S. at 499–500, 104 S.Ct. at 1959 (emphasis in original). *Accord Connaughton v. Harte Hanks Communications,* 842 F.2d 825 (6th Cir.1988) (discussion of conflict in applying independent judicial review); *Brown & Williamson Tobacco Corporation v. Jacobson,* 827 F.2d 1119 (7th Cir.1987) (same). Weighed against these considerations, we are mindful that the mere fact that a publication is false and defamatory is not sufficient to support a finding of liability based on actual malice. *Marcone v. Penthouse, supra.* The central meaning of the First Amendment, made applicable to the states through the Fourteenth Amendment, requires a privilege of fair comment and honest mistake of fact. *New York Times, supra.* In fact, the United States Supreme Court has stressed:

> "Realistically, ... some error is inevitable; and the difficulties of separating fact from fiction convinced that Court in New York Times, Butts, Gertz, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material."

*Herbert v. Lando,* 441 U.S. 153, 171–72, 99 S.Ct. 1635, 1646, 60 L.Ed.2d 115 (1979). "[E]rroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they need to survive." *Hepps v. Philadelphia Newspapers, Inc.,* 506 Pa. 304, 317, 485 A.2d 374, 381 (1984), *rev'd on other grounds, Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (quoting *New York Times,* 376 U.S. at 271–72, 84 S.Ct. at 721–22). Mere negligence or carelessness is not evidence of actual malice or malice in fact. *New York Times,* 376 U.S. at 283 n. 24, 84 S.Ct. at 728 n. 24.

In *Sprague v. Walter, supra,* this Court clearly distinguished between evidence of malice as ill will—as use of the term most often connotes—and "actual malice" which is defined as publication with knowledge of falsity or reckless disregard for the truth, by writing:

We wish to lay one item to rest here. There were repeated accusations made and substantiated that Walter [author] had a "vendetta" against Sprague [plaintiff], and he was "obsessed" with seeking retribution for the wiretapping conviction he had suffered at the hands of Mr. Sprague. Nonetheless, not one of the witnesses presented by the plaintiff could state that Walter intended to accomplish his deed by fabrication/falsehood. Thus, regardless of Walter's motive, such evidence would not transform itself into "actual malice." As the Supreme Court of the United States has observed:

> [U]nder a rule ... permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood, 'it becomes a hazardous matter to speak out against a popular politician, with the result that the dishonest and incompetent will be shielded.' Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875, 898 (1949).

*Garrison v. Louisiana,* 379 U.S. 64, 73–74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). See *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).

357 Pa.Super. at 606 n. 18, 516 A.2d at 725 n. 18.

■■■ A defamation plaintiff carries both the burden of production and the burden of persuasion. *Sprague v. Walter,* at 714. Accordingly, we must review the entire record in this case to determine whether plaintiff has demonstrated with clear and convincing evidence that the author of the September, 1976 article wrote with the "actual malice" necessary for Curran to prevail in his claim. In so doing, we will review the entire record with deference to the presumed jury findings of fact and without second guessing the jury on the credibility of the witnesses. We conclude that the evidence of the publication lacks both sufficient substance and clarity to meet the standard required to show actual malice.

## BACKGROUND

We have reviewed over seventeen hundred pages of trial testimony and exhibits generated by this action and have

synthesized the relevant facts to be as follows. This public official defamation action was brought by Robert Curran against Philadelphia Newspapers, Inc. based upon an *Inquirer* news article, published on Friday, September 24, 1976. Curran became the U.S. Attorney for the Eastern District of Pennsylvania in August of 1972 and resigned on April 30, 1976. Following his resignation, Curran was replaced by David W. Marston (hereinafter "Marston"). PNI owns and operates the *Inquirer*, a major metropolitan evening newspaper for the Philadelphia area.

The news article in question reported a press conference announcing the return of an indictment against Theodore Rubino, then a Republican leader of Chester County, in eastern Pennsylvania. At the press conference, Marston indicated that the indictment demonstrated a commitment to the vigorous pursuit of political corruption prosecutions, regardless of the political party involved. Jan Schaffer (hereinafter "Schaffer"), an *Inquirer* reporter, attended the press conference. Pursuant to standard *Inquirer* procedure and in order to meet press deadlines, she did not write the story herself. Rather, she called Robert Frump (hereinafter "Frump"), another *Inquirer* reporter familiar with the Rubino investigation, and relayed to him the contents of the press conference. Frump then authored the article which is at the center of this controversy. The *Inquirer* article, which focused on the return of the indictment and in that connection mentioned the press conference, said in pertinent part:

Marston, who replaced former U.S. Attorney Robert Curran on June 30, also made reference to accusations that Curran did not vigorously pursue white-collar crimes *if the suspects were politically well-connected.* Both Curran and Marston were appointed by Republican administrations.

"There is no place for politics in prosecution," Marston said of the accusations. "If it's a public corruption case and we can make it, we'll make it." (emphasis added)

The six emphasized words are at the heart of this action. What Schaffer had actually reported to Frump was that Marston had said:

I think people have alleged in other districts and in other times it's always other parties that get prosecuted. There's no place for politics in prosecutions. We don't ask whether people are Democrats or Republican. If it's a public corruption case and we can make it, we'll make it.

■ The threshold determination of whether a statement is capable of defamatory meaning depends on the general tendency of the words to have an effect such as to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962). *See also Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984). Whether a statement is capable of defamatory meaning is a question the judge, as distinguished from the jury, must determine. *See Franklin Music Co. v. American Broadcasting Co., Inc.*, 616 F.2d 528, 540 (3d Cir.1979); *Corabi*, 442 Pa. at 442, 273 A.2d at 904. The lower court ruled that the article was capable of a defamatory meaning.

Frump testified that he assumed that Marston was referring to Curran by admitted remarks. He testified that his incorrect assumption or understanding was based upon his knowledge of news articles questioning Curran's independence as a prosecutor as well as Frump's knowledge of federal investigators' dissatisfaction with Curran's pursuit of political corruption cases and upon reports of similar dissatisfaction within the Department of Justice.

When Schaffer read Frump's article on the evening of publication, she noticed the incorrect addition of a reference to Curran. As a result, she contacted Frump immediately and informed him of the error. Prior to hearing from Curran that the article contained incorrect information, the *Inquirer* printed an item called "Clearing the Record" in all

its Sunday editions, the most widely read edition of the *Inquirer*. "Clearing the Record" was published two days following publication of the alleged defamatory article. That article identified the story at issue, repeated what had been said about appellant, admitted this was an error, and confirmed that Marston had made no reference to Curran.

DISCUSSION

Curran asserts that the defamatory article not only indicated that he was less than enthusiastic in pursuing political crimes but, most importantly, that it implies he actually acted to obstruct the proper administration of justice, in particular, the Rubino investigation.[7] PNI claims that the lower court erred in denying its motion for judgment notwithstanding the verdict, arguing there is no evidence that Frump entertained any doubt, much less serious doubt, as to the truth of what he wrote. Further, PNI argues, the gist of the defamatory statement—that Curran had been accused by various parties, including Justice Department officials, of not vigorously pursuing political corruption cases—was proven to be substantially true and conceded by Curran himself.

Our analysis begins with a review of the evidence to determine whether it is sufficient to support a finding of "actual malice." The showing of malice required for the forfeiture of the free speech privilege is not presumed but is a matter for proof by the plaintiff. In discussing this issue, we will first view that evidence which goes to Frump's actual knowledge and state of mind at the time he wrote the disputed article.[8]

7. By the evidence, PNI acknowledges that Curran was an honest public official.

8. We are fully aware of the extensive testimony presented on plaintiff's behalf but much of that was directed at proving such issues as the falsity of the publication, the defamatory meaning of the publication, Curran's good reputation, and the damages he suffered as a result of the libelous statement. For the purposes of our discussion, we have assumed that the publication was false and libelous. We have confined our review to one narrow issue, that is, whether plaintiff has shown, by the requisite standard, evidence that Frump authored the article with "actual malice".

The lower court denied PNI's motion for judgment n.o.v. citing several reasons. It considered the fact that Frump knew that the Rubino investigation had begun in the Eastern District office before Marston had taken office, ostensibly during Curran's tenure, and failed to include that information in the article. The court also considered the fact that the "Clearing the Record" article reiterated the original defamation without informing the readers that the Rubino investigation had commenced under Curran. Finally, the court considered the fact that Frump had not "tested" the contents of the article by reviewing it with Schaffer or contacting Marston or Curran. We find none of these considerations, alone or in conjunction, to be dispositive.

■■■■ In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Supreme Court invalidated a state "right to reply" law because it intruded into the function of editors. The Court reasoned:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.

418 U.S. at 258, 94 S.Ct. at 2840. *See Curran I,* 261 Pa.Super. at 136 n. 5, 137 n. 7, 395 A.2d at 1351 n. 5, 1352 n. 7. Accordingly, we must give wide deference to PNI's editors' choice of what to print in the limited space allotted to the "Clearing the Record" column.[9] The decision not to include language informing the readers that the Rubino investigation had commenced during Curran's tenure may not be used as the basis of a determination that PNI maliciously failed to include the fact, thus supporting a finding of actual malice.[10] As to the fact that Frump failed to "test" the article before publication, he did testify that he

9. The record does not clearly inform us who prepared the "Clearing the Record" column.

10. Plaintiff and the lower court make much of the fact that, in the "Clearing the Record", PNI repeated the defamatory language. We are puzzled how PNI could retract the language without informing the readers what language was being retracted.

had called Rubino to get his comments on the indictment as well as other government officials in Chester County who had been critical of Rubino's administration. He further testified that he checked his files for background information on Rubino and incorporated that into the story. The Rubino indictment was a breaking news story of regional importance and not the type of story to which several days could be devoted in writing. It is undisputed that Frump was writing with a deadline, a factor which must be weighed in his favor.

As cases following *New York Times* have made clear, our focus is upon what a defendant did, as compared to what it did not do, as the measuring rod against which its conduct is to be assessed. *See Sprague v. Walter, supra.* In *New York Times,* the Court held that defendant Time's failure to retract upon plaintiff's demand was not adequate evidence of malice for constitutional purposes. *See also Bose Corporation, supra* (finding defendant author's refusal to admit he made a mistake when confronted did not establish that he realized the inaccuracy at the time of publication). Therefore, we cannot affirm the lower court's ruling based on its reasoning and we will conduct an independent review.

The plaintiff first called as a witness J. Clayton Undercofler. Between 1972 and sometime after Curran left office, Undercofler served as an Assistant United States Attorney, Acting Chief of the Criminal Division in the Eastern District, working directly with Curran. Undercofler testified extensively about a conflict between Curran's office and that of the Philadelphia special prosecutor, Walter Phillips. This controversy was a matter of public knowledge and the subject of numerous newspaper articles. The conflict culminated when Curran took an unusual step and subpoenaed documents in the possession of the special prosecutor in the midst of a state special grand jury investigating police and municipal corruption in Philadelphia's Democratic City Committee. The parties then were required to take the matter to the judge who was supervising the special grand jury,

thus placing the probe in the public eye and prompting a scathing editorial in the *Inquirer*, as follows:

> No one has a monopoly on prosecutive responsibility, but the special prosecutor's office, given proper support, is a vitally important effort. If it were allowed to be undermined, the certain result would be an active encouragement of graft in institutionalized proportions.
>
> \*   \*   \*   \*   \*   \*
>
> It was unfortunate that Mr. Curran did not turn to Friday's course of reason [withdrawal of subpoenas] until after it had been made clear that the records being sought are under the legal jurisdiction of Judge Takiff, not Mr. Phillips. Whatever misunderstandings and motives may have been involved in Mr. Curran's action, one inevitable impression was that the U.S. attorney's office was, inadvertently at best, serving the ends of powerful forces within both the Republican and Democratic parties which would like nothing better than to cripple the special prosecutor's operation.

*Philadelphia Inquirer*, August 6, 1974.

The most relevant witness, of course, was Frump himself. Plaintiff called Frump on direct examination.[11] He testified that as an *Inquirer* reporter, he worked in the Chester County borough where Rubino was active politically and, therefore, had background knowledge of the Rubino investigation. He knew that the Rubino investigation had commenced in the Eastern District prior to Marston taking office and that it was an outgrowth of an investigation in Harrisburg involving insurance investigators and the U.S.

---

**11.** Generally, if a party calls an adverse party as a witness in a civil proceeding, this testimony is conclusive unless the testimony is contradicted by the direct testimony of other witnesses or is impeached by its own inconsistencies or by such intrinsic improbability or obvious falsity as to stamp it as unworthy of belief. *Kelly v. Oxgrove Development Corp.*, 456 Pa. 306, 319 A.2d 424 (1974). While appellee argues that rules of evidence such as this have been considerably relaxed in application, citing *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976), the rule has not been abandoned by our Supreme Court and, therefore, we are bound by it. *See also, Hrivnak v. Perrone*, 472 Pa. 348, 372 A.2d 730 (1977); *Argo v. Goodstein*, 438 Pa. 468, 265 A.2d 783 (1970).

Attorney's office in the Middle District of Pennsylvania. Frump testified that he had an undisclosed reliable source of information, originating in the F.B.I. office [12], that the federal agencies involved were unhappy with the aggressiveness with which Rubino's case was being prosecuted and upon reports of similar dissatisfaction within the Department of Justice. Frump further testified:

What I assumed and what I'll tell the jury, and what I'll tell you is that I assumed that David Marston was coming on as a crusading United States Attorney, that he was contrasting what he did with what Mr. Curran had done.

It was a faulty assumption that I made. It was a mistake, and I've been playing it over in my head for eight years as to how I did it. It was not something that I intended maliciously to hurt Mr. Curran. It simply was not that way.

\* \* \* \* \* \*

Any fact—any fact has a context and it's placed in context, and that's, that's what my intent was, was to place it in the context of the previous several year's debate over prosecutions of political corruption.

Frump stated that much of his knowledge about the controversy surrounding Curran was based on information available through the public media, such as newspaper articles and television broadcasts. This general information was supported by his alleged discussions with several Chester County Republican officials, all of whom were, he admitted, "anti-Rubino" people.

In support of Frump's testimony that he was aware of the public debate surrounding Curran's reputation for being

12. The fact that F.B.I investigators were expressing dissatisfaction with Curran's office was supported by the testimony of a disinterested witness, Rudolf W. Giuliani, the third highest administrative official in the Justice Department during Curran's tenure as U.S. Attorney. Guiliani's testimony also reinforced Frump's claims that the Justice Department was less than satisfied with Curran's performance and, in fact, that there was serious discussion within the Justice Department about asking Curran to resign.

less than vigorous in prosecuting white collar crimes, the defense admitted into evidence several news articles relating to that issue which Frump testified he had read prior to writing the article in question. Included in those articles was one contained in the *Philadelphia Evening Bulletin* which included a survey of various controversies surrounding Curran's tenure in office and the following:

> Although he insisted when he submitted his resignation yesterday that his early departure is entirely voluntary, it has been known for some time that his bosses in Washington were dissatisfied with his office's performance.
>
> In an era of hard-knuckled, racket-busting federal prosecutors in Pittsburgh, Chicago, Baltimore and Newark, N.J., Curran's Philadelphia office was viewed as "lackadaisical" according to one U.S. Justice Department source.

*Philadelphia Evening Bulletin,* April 1, 1976. Finally, an exhaustive *Philadelphia Magazine* article provided extensive background into Curran's rise to power in Delaware County politics and his political connections which were his ticket to the U.S. Attorney's seat. That article included many complimentary statements regarding the professionalism that Curran had brought to the Eastern District office, the high caliber of the assistant U.S. attorneys he had hired, and the recent successful prosecution of a local judge. However, the article also outlined Curran's background which brought into question his ability to perform as a federal prosecutor. The article stated, "His trial experience was severely limited and his investigative credentials nonexistent. Worst of all, his political ties were as binding as an umbilical cord." The article went on to relate how Curran had been handpicked for the U.S. Attorney position by Harry McNichol, a Chester County king-pin, who had previously been investigated and subpoenaed in connection with racketeering in Chester County and county-wide macing and had been represented by none other than Robert Curran. McNichol was never indicted, but irreparable harm

had been done to Curran's reputation as an independent prosecutor. The article continued:

A black cloud of innuendo that would hover over Bobby Curran's prosecutorial career had already taken shape. Later, because of McNichol's well-known friendship with Frank Rizzo, Curran would also be accused of taking it easy on the mayor as well as Delaware County.

*Philadelphia Magazine,* May, 1976, p. 131–32. The article continued to outline the dispute between Curran and special prosecutor Phillips.

Further, on direct examination, Frump was asked to explain his claim that a reliable confidential source had informed him that federal investigators believed that Curran was "dragging his heels" in the investigation of Rubino, and that as a result, prosecutors in the Middle District of Pennsylvania had begun and were pressing the investigation rather than Curran's office. In responding to that question, Frump stated that he received this information sometime after March, 1976 while preparing a story on the Rubino investigation. He testified that the information had potential as a news story and, therefore, he attempted to verify the information by calling the FBI office involved. The FBI contact replied "No comment" and referred all comment to the U.S. Attorney for the Middle District. Frump then testified:

I then called up the U.S. Attorney for the Middle District, and I believe his name was Salvatore Cognetti. I asked Mr. Cognetti essentially the same question that I had posed to [FBI]. Mr. Cognetti said that while he could confirm that his district was handling the Rubino investigation, that he could not comment on the other conditions that my source had described [i.e., was Curran "dragging his heels"].[13]

13. In his testimony, Curran insisted that the Rubino investigation started in the Eastern District and that a grand jury was never convened in the Middle District to investigate Rubino, but did admit that it arose from information received from the Middle District office. This testimony does not positively dispute Frump's confiden-

This testimony by Frump supported PNI's contention that Frump was familiar with the Rubino investigation and, therefore, the most reasonable reporter to write the indictment story.

The most damaging news impeaching Curran's reputation as a prosecutor, regardless of its truth or falsity, of which Frump had knowledge prior to publication, came on April 1, 1976 when the *Inquirer* ran a story announcing Curran's resignation and Marston's nomination. That story included the revelation that "if Curran had not resigned, he would have been asked to resign at a meeting he had scheduled today with Harold Tyler, Deputy Attorney General with the Justice Department." [14] It was with this undisputable recent news background in mind that, Frump claims, he misinterpreted Marston's comments at the announcement of the Rubino indictment.

Like the plaintiff in *Sprague v. Walter, supra,* Curran attempted to impeach Frump's testimony by showing some actual ill will between himself and PNI and imputing that feeling to Frump. Curran testified to a bad relationship between himself and Schaffer, the *Inquirer* reporter who covered the federal courthouse, prior to the September, 1976 publication. He indicated that he thought she was improperly annoying his employees who called in sick and, to retaliate, he had withheld information from her which he provided to reporters for other local newspapers. Curran's allegation of bad feelings with Schaffer was not corroborated by any other witness. In fact, Schaffer was never questioned about this incident during the course of trial.

Plaintiff also sought to challenge Frump's assertions of lack of ill will by constantly reminding the court and jury that, at the time of publication of the September article, a lawsuit by Curran against PNI was pending in regard to

tial information that the Middle District was continuing to investigate Rubino's activities.

14. A "leak" by James Seif, Special Assistant to the Assistant Attorney General, described in full in the Supreme Court's earlier opinion in this case, *Curran I, supra,* indicated that if Curran had not resigned his post, he would have been fired.

the April 1, 1976 *Inquirer* article. *See* discussion *infra.* However, Curran did not show that Frump had any awareness of the pending lawsuit nor that it had in any way affected him. As our review is based on Frump's subjective state of mind, neither Curran's bad relationship with Schaffer nor the pendency of the lawsuit constitute clear and convincing evidence of "actual malice".[15]

Curran also argues that he has shown actual malice by "clear and convincing" evidence in the fact that, as a professional journalist, Frump had a duty to limit his story to actual facts and should not have speculated as to what Marston meant since the writer's thoughts, impressions, opinions, understandings, or interpretations are not relevant in a news story that does not proport to be opinion or editorial.[16] It is beyond dispute that Frump misquoted Marston's comments to Curran's detriment and that they were false and defamatory. However, we are unable to find any "clear and convincing" evidence which refutes Frump's claim of good faith mistake. We recognize that it is within the jury's province to believe or disbelieve the witness' testimony. However, in this case the record includes ample evidence supporting the reasonableness of Frump's error and very little, certainly less than "clear and convincing", evidence which would show that Frump wrote the article with knowledge of its falsity or reckless disregard thereof. While we must give a plaintiff the benefit of all reasonable inferences logically deducible from the record, the mere fact that Frump made an unprofessional mistake does not constitute clear and convincing evidence of actual malice.

While Frump's testimony, by itself, would not rebut any inference of actual malice that the record might otherwise

**15.** Curran implies that perhaps Ms. Schaffer passed misinformation to Frump or that the article was altered in the editorial process. However, there is nothing in the record to support such implication. It is beyond question that a jury's finding may not be based upon pure speculation.

**16.** *See Woods v. Evansville Press,* 791 F.2d 480, 489 (7th Cir.1986) (reporter's journalism skills are not on trial in a libel case).

support, it is equally clear that the record does not contain the quality of evidence necessary to support a finding of "actual malice." Accepting all of the purely factual findings the jury may have considered, we hold, as a matter of law, that Curran did not present clear and convincing evidence that Frump wrote the September, 1976 article with knowledge that it contained a false statement or with reckless disregard of the truth. Accordingly, we conclude that the lower court erred in denying PNI's motion JNOV.

Having thus concluded, we feel compelled to comment on the facts of this case as well as the state of libel law in general. Rumors emanating from high official places plus a reporter's envious position of not being responsible to be an exhaustive investigator, can sprout a most defamatory and false representation of a person's true nature and character. Out of a depository of news, even though unsubstantiated, a person may be victimized as Curran in this case may very well have been. Despite the rumors, reports, information, and accusations coming from high officials in the Justice Department, it is a fact that no evidence was presented in this case showing any statistics, charts, numbers, or measurements for comparing Curran's performance in office with that of other United States Attorneys in various districts around the country. Each district has a different number of assistant U.S. Attorneys and a different case load both in numbers and kinds of cases. Curran's office, during his term as United States Attorney, was highly decorated by the Department of Justice with awards for excellence in performance of duties. Curran himself was also given a most unique honor when he became the only United States Attorney for the Eastern District of Pennsylvania to be commended by the Board of Judges of the United States District Court for the Eastern District of Pennsylvania for his outstanding service.

In this writer's opinion, it is former members of the Attorney General's office and the U.S. Department of Justice who should be castigated for their deplorable behavior as presented by the evidence in this case. But, the damage

was done nevertheless by the unofficial accusations. The telephone calls from an Assistant Attorney General to a reporter of the *Inquirer*, FBI complaints, news stories appearing in the *Inquirer*, the *Philadelphia Bulletin* and the *Philadelphia Magazine* were all background that gave Frump ample reason under the present law and totality of the circumstances to believe that what he said in his article of September 23, 1976 was true. Having said all this, reporter Frump is not to be faulted for having reported in his article of September 23, 1976 what clearly had been part of the Justice Department's high authority's complaint against Curran.

Since *New York Times*, the many opinions of the United States Supreme Court have been sending out messages that have a reverberating and harsh sound that grates against the sensitive ear of men and women whose long standing good reputation is assaulted.[17] This tension between First Amendment rights and a person's right against unjust defamation will always be present for, human nature being what it is, there is always a temptation to sensationalize or to be less than accurate in reporting a story. The delineating line between these two invaluable rights is being slowly obliterated, permitting one to dominate over the other. A plaintiff must be given a fairer chance in this game of libel against reputation.

As it stands now, the law holds that a plaintiff can recover in a media libel law suit if he can prove that the defamer spoke with actual knowledge that the words were false or with reckless disregard of whether the words were false. This is a difficult task for the plaintiff, to say the least, but when the law holds that the defamer has a right

17. In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the United States Supreme Court, reversing the Pennsylvania Supreme Court, held that in a public official or public issue defamation case, the plaintiff should bear the burden of proving the falsity of the alleged defamatory publication. While the holding in *Hepps* did not apply to the case *sub judice*, it is further indication of the shifting of the burden in public defamation cases to the plaintiff.

to be wrong [18], has the right to be negligent in ascertaining the truth [19], has a right to carry ill will against the defamed [20], has a right not to be fair, and has a right to speak from undisclosed sources [21], the burden for the plaintiff becomes almost too heavy to carry. It is in this context that bad facts, as we have found in this case, make for bad results such as we have no choice in finding here.

And so, the tension goes on between our basic interest in a vigorous and uninhibited press and the interest of our citizens in a good and unchallenged reputation with the swing in favor of the former. In *Gertz v. Welch* it was held:

> Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury. As Mr. Justice Harlan stated, "some antithesis between freedom of speech and press and libel actions persists, for libel remains premised on the content of speech and limits the freedom of the publisher to express certain sentiments, at least without guaranteeing legal proof of their substantial accuracy." *Curtis Publishing Co. v. Butts, supra,* at 152, 18 L.Ed.2d

**18.** *New York Times v. Sullivan, supra* (mere failure to discover misstatements is constitutionally insufficient to show the recklessness that is required for a finding of actual malice).

**19.** *See Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 (3d Cir.1985) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 84 L.Ed.2d 405 (1963):
The Court granted First Amendment protection to negligently false statements in order to afford the media the "breathing space" necessary to avoid a chilling effect on constitutionally valuable speech, a matter of critical importance to our democratic system. 754 F.2d at 1080–81. *See also St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325 (failure to investigate, without more, does not demonstrate actual malice).

**20.** *See Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (ill will and a desire to do harm are not alone sufficient to show malice).

**21.** In *Sprague v. Walter,* 357 Pa.Super. 570, 516 A.2d 706 (1986), *affirmed* 518 Pa. 425, 543 A.2d 1078 (1988), this court affirmed a media-defendant's use of its sources and information as proof of verification or evidence of responsibility even though the plaintiff may not cross-examine the source of such information because it is protected by the Pennsylvania Shield Law. 42 Pa.C.S.A. § 5942.

1094, 87 S.Ct. 1975. In our continuing effort to define the proper accommodation between these competing concerns, we have been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise. *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). To that end this Court has extended a measure of strategic protection to defamatory falsehood.

The *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the commonlaw rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures. *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts, supra.* 418 U.S. at 342–43, 94 S.Ct. at 3008.

With all of the preceding in mind, we reverse the order of the court below which denied PNI's motion for judgment n.o.v. Order reversed; appellant dismissed.

BECK, J., concurred in result.