# Wagstaff v. The Morning Call Inc.

C.P. of Lehigh County, no. 94-C-2104.

*Victor N. Lea,* for plaintiff.
*Malcolm J. Gross,* for defendants.

REIBMAN, *J.,* April 12, 1999—This is a defamation action arising out of a newspaper article. Before the court is defendants' motion for summary judgment.

The article was printed in the January 8, 1994 edition of defendant The Morning Call Inc.'s newspaper of general circulation, *The Morning Call,* under the headline "N.J. Holdup Suspect Has Storied Record; Las Vegas Pair Caught Following Police Chase" and byline of defendant Kristin Casler. It is about two men who came to the Lehigh Valley[1] from Las Vegas to commit a robbery at a New Jersey bank. The article states the two men, one armed with a shotgun and the other with a handgun, entered the Pohatcong Township, Warren County, bank at 11 a.m., announced the holdup, and left the bank with an amount of money. A dye pack in the money exploded as they were leaving the bank, and they abandoned the money. A police officer arrived as the men fled the bank in their automobile. He was joined by another officer. The article describes an ensuing automobile chase in which the men fired multiple gunshots at the pursuing police officers. One of the robbers was wounded in the arm by return fire from the police and both men were captured. A New Jersey

---

1. The Lehigh Valley includes Lehigh and Northampton counties, PA, and Warren County, NJ.

prosecutor is quoted as describing the incident as "a very violent episode."

The article describes one of the men, John Jacob Welty, as a former resident of the Lehigh Valley area and "longtime bank robber." It states:

"Officials described 'Jake' Welty as a daring 'Dillinger-type' criminal who lives for the thrill of his crimes, serves his time and gets right back behind the gun. The 64-year-old who leaned out the window and fired at police while speeding down a highway on Thursday has a criminal record dating to 1948, including convictions for bank robberies in Bath and Pohatcong and for stealing government rocket launchers, according to *Morning Call* files. He also escaped from Rockview State Prison in 1957."

The article proceeded to provide a more detailed account of Welty's extensive criminal record, which began when he was 19 years old, was concentrated within the Lehigh Valley, where *The Morning Call* is circulated, and included a period of incarceration at "the federal prison in Marion, Ill., where the most hardened criminals are sent."

The article states Welty "stored guns and dynamite at his base in an Allentown garage" and "[a]fter Welty and Gallegos [the second man] were arrested, police learned they had been using Wagstaff's Auto Repair at 1123 North Fenwick Street, Allentown, as their base of operations. Investigators also believed a third suspect might return there."

The article reported law enforcement officers, including "the Allentown Emergency Response Team and FBI," entered the garage with a search warrant and

"found two sticks of dynamite, two sawed-off shotguns and other weapons, smoke bombs and .45 caliber Black Talon bullets that flare at the end, causing extensive body damage, Allentown Capt. Ronald Manescu said. Police also found the suspects' belongings, identification and plane tickets."

Finally, the article states:

"The man who leases the garage, James Transue of Palmerton, approached the garage while police watched from afar. He knocked on the door, and when no one answered he attempted to drive away. Police stopped and questioned him, but Manescu said they had no evidence he was involved in the holdup, and he was released.

"According to the search warrant application, Gallegos admitted the robbery. He told police the BMW used in the holdup was brought to the Allentown garage where he and Welty were staying. Officials said the car was stolen in Bethlehem Township. 'From the garage, we got additional leads which we're actively pursuing,' [the New Jersey prosecutor] said."

Plaintiff, William Wagstaff, owner of W.M. Wagstaff Auto Repair, instituted this defamation action alleging that Wagstaff's Auto Repair was not used as a base of operations for Welty's criminal activity, and that as a result of the article's false statement to the contrary, he has suffered extreme mental anguish, damage to his reputation, personal humiliation and pecuniary loss. The Morning Call Inc. and Casler (collectively defendants) move for summary judgment on the grounds that plaintiff has failed to meet his burden of proving

falsity,[2] that the article is substantially true,[3] and that plaintiff is a public figure and as such cannot establish by clear and convincing evidence defendants acted with actual malice.

2. A plaintiff seeking damages against a media defendant for speech of "public concern" must first establish the defamatory statements were false. While recognizing the burden of requiring the plaintiff to show falsity will "insulate from liability some speech that is false, but unprovably so," the United States Supreme Court concluded that to be the better consequence than deterring or chilling free speech by placing the burden on media defendants to prove truth. See *Ertel v. Patriot-News Co.,* 544 Pa. 93, 99, 674 A.2d 1038, 1042 (1996), citing *Philadelphia Newspapers Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986); see also, *Dougherty v. Boyertown Times,* 377 Pa. Super. 462, 474, 547 A.2d 778, 784 (1988).

Plaintiff contends defendants falsely identified Wagstaff's as the location of the alleged bank robbers' base of operations when they really operated out of a private storage garage next to and separate from Wagstaff's, albeit in the same building. The storage garage and Wagstaff's have separate addresses, parking lots and tract assignments; and James Transue rented the storage garage and had placed a padlock on it. On the other hand, defendants contend plaintiff is making a distinction without a difference because the entire building is operated and controlled by Wagstaff's; the building was identified with only one sign which read "Wm. Wagstaff Auto Repair"; tax returns do not indicate a distinction between the two spaces; the bills for both spaces were apparently paid from Wagstaff's checking account; the entire building is insured by Wagstaff's; and the building which houses both spaces is covered by one commercial loan.

Viewing the foregoing in the light most favorable to plaintiff, *infra,* a genuine issue of material fact exists as to whether plaintiff can establish the alleged criminal activity took place in an area separate from Wagstaff's. Compare *Ertel,* 544 Pa. at 99, 674 A.2d at 1042 (summary judgment granted where plaintiff failed to offer evidence that any of the material at issue was false and his complaint was

"Summary judgment is properly entered where the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits demonstrate that no genuine, triable issue of fact exists and that the moving party is entitled to judgment as a matter of law." *Smitley v. Holiday Rambler Corp.*, 707 A.2d 520, 525 (Pa. Super. 1998). The burden rests squarely on the moving party to prove that no genuine issue of material fact exists. *Id.* However, an adverse party is required to identify in the response to the summary judgment motion "evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced." *Eddy v. Hamaty*, 694 A.2d 639, 643 (Pa. Super. 1997) (citing Pa.R.C.P. 1035.3).

In reviewing a motion for summary judgment, the record is examined in the light most favorable to the non-moving party and all doubts are to be resolved against the moving party. *Long v. Yingling*, 700 A.2d 508, 512 (Pa. Super. 1997). Moreover, summary judgment should be granted only in cases that are free and clear from doubt. *Hoffman v. Brandywine Hospital*, 443 Pa. Super. 245, 250, 661 A.2d 397, 399 (1995).

In an action for defamation, a plaintiff must prove: (1) the defamatory character of the communication;

---

silent as to any falsity); and *Bobb v. Kraybill*, 354 Pa. Super. 361, 364, 511 A.2d 1379, 1381 (1986) (summary judgment granted where plaintiff was unable to claim that the articles contained any falsehoods). Therefore, defendants' motion is denied on this ground.

3. In his order and opinion dated February 26, 1996, the Honorable James N. Diefenderfer, now senior judge, concluded that whether the article was true or not presented an issue of fact for the jury.

(2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; and (6) abuse of a conditionally privileged occasion. 42 Pa.C.S. §8343(a);[4] *Jones v. Snyder,* 714 A.2d 453, 455 n.6 (Pa. Super. 1998); *Iafrate v. Hadesty,* 423 Pa. Super. 619, 621 A.2d 1005 (1993).

Current defamation law is the culmination of various attempts by our state and federal courts to balance the competing interests between the common law of defamation, which is designed to protect the reputation of individuals, and First Amendment guarantees, which are designed to assure vigorous debate on issues of public concern. In *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court sought to ensure the "uninhibited, robust, and wide-open" debate on public issues by mandating that liability will not arise in cases brought by public officials against print media absent a showing, by clear and convincing evidence, of actual malice, *to wit,* the statement was made with knowledge that it was false or with reckless disregard of its truth or falsity. Three years later, the court extended the constitutional standard of "actual malice" to "public figures." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d

---

4. Section 8343(a) also required a plaintiff to prove special harm resulted to him from the alleged defamatory publication. However, Pennsylvania has adopted the rule of Restatement (Second) of Torts §569 (1977), that all libels are actionable without proof of special harm. *Curran v. Philadelphia Newspaper Inc.,* 376 Pa. Super. 508, 512 n.3, 546 A.2d 639, 641 n.3 (1988).

1094 (1967) (plurality opinion). The court, however, specifically refused to extend this standard to private persons. *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 342-50, 94 S.Ct. 2997, 3008-3012, 41 L.Ed.2d 789 (1974).

In *Gertz,* Justice Powell offered general guidance for defining circumstances when an individual may be classified as a public figure which would necessitate applying the rigorous *New York Times* actual malice standard. In the first instance, there are "all-purpose public figures," such as politicians who have become household names. These individuals "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." See *Schiavone Const. Co. v. Time Inc.,* 847 F.2d 1069, 1076 (3d Cir. 1988), citing *Gertz,* 418 U.S. at 345. The second, and more common type of public figures, are "limited purpose public figures." These individuals voluntarily inject themselves or are "drawn into a particular public controversy" and thereby become a public figure for a limited range of issues or for a narrow purpose.

Defendants do not contend plaintiff is a public figure for all purposes. Rather, they contend he is a limited purpose public figure because the robbers who were the subject of their article took up residence in his building.[5]

The typical limited purpose public figure will have voluntarily thrust himself to the forefront of a particular public controversy or concern in a manner intended

---

5. Whether a person is a public or private figure is a question of law to be determined in the first instance by the court. *Brown v. Philadelphia Tribune Co.,* 447 Pa. Super. 52, 58, 668 A.2d 159, 162 (1995); *Iafrate,* 423 Pa. Super. at 623, 621 A.2d at 1007.

to obtain attention. For example, in *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 (3d Cir. 1985), *cert. denied,* 747 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 1151 (1985), the United States Court of Appeals for the Third Circuit found the plaintiff, an attorney who represented members of notorious motorcycle gangs and had social contacts with its members, was a limited purpose public figure on the issue of his alleged participation in a drug conspiracy with them. In *McDowell v. Paiewonsky,* 769 F.2d 942 (3d Cir. 1985), an architect who participated in numerous known controversial building projects was a limited purpose public figure as to his participation in those projects. In those instances, by involving themselves with controversial persons or projects, it was foreseeable for the plaintiff to become the subject of discussion about them.

However, it is not necessary for a plaintiff to have injected himself voluntarily into a public controversy, or foresaw becoming involved with it, in order to be deemed a limited purpose public figure. In *Gertz, supra,* Justice Powell noted an individual could be "drawn into" a particular public controversy through no purposeful action on his own. 418 U.S. at 345. For example, in *Dameron v. Washington Magazine Inc.,* 779 F.2d 736 (D.C. Cir. 1985), an air-traffic controller who had been on duty at the time of an airplane crash was deemed a limited purpose public figure for the purpose of discussing the crash. In *Wells v. Liddy,* 1 F. Supp.2d 532 (D. Md. 1998), a secretary at the Democratic National Committee at the time of the Watergate break-in was deemed to be a limited purpose public figure as to the reasons behind the break-in.

Whether a particular person is a limited purpose public figure depends upon the nature of the controversy and the extent of plaintiff's involvement with it. *Wolston v. Reader's Digest Assoc.,* 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979). For example, in *Wolston,* the plaintiff had pled guilty to contempt of court when he failed because of ill health to respond to a subpoena directing him to appear before a grand jury investigating a suspected Soviet espionage ring. He promptly communicated his desire to testify. When the government rejected his offer, he passively accepted a one-year suspended sentence and was placed on three years probation. The alleged defamatory publication appeared 16 years later. It claimed plaintiff had been indicted for espionage and had been a Soviet agent. The Supreme Court, with the benefit of 16 years of hindsight, concluded plaintiff had "no special prominence" in the public issue, the investigation of Soviet espionage. His only involvement was to defend himself against the contempt charge when he was dragged unwillingly by the government into the controversy.

In *Gertz, supra,* a youth had been shot and killed by a police officer. Plaintiff was a lawyer who represented the youth's family in a civil action against the police officer. The state prosecuted the police officer criminally for murder. Plaintiff attended the coroner's inquest into the youth's death, but neither discussed the police officer with the press nor played any part in the criminal proceeding. The Supreme Court concluded plaintiff's connection with the police officer's criminal prosecution was too remote to qualify him as a public figure in an article about the criminal prosecution.

In *Wolston* and *Gertz,* the plaintiffs' involvement was too attenuated to the public controversy, the investigation of Soviet espionage and the criminal prosecution of the police officer, to make them public figures even for the limited purpose of those subjects about which the alleged defamatory publications were written.

In *Iafrate, supra,* the Superior Court concluded the plaintiff was not a public figure because the nature of the controversy was purely private. In *Iafrate,* plaintiff planned a July 4 party for between 150 and 200 guests on his "rural tract" of land near Slatington, Lehigh County. His neighbor contacted the newspaper to express her concerns about the party. The neighbor apparently exaggerated the number of guests anticipated, and the number of bands participating, at the party. The newspaper published an article quoting the neighbor, who inferred the party would attract "traffic, garbage, drugs, who knows . . . ." The Superior Court found there was no public controversy whatsoever until after the neighbor contacted the newspaper and the newspaper published its article repeating her fears and concerns. At the time the article was published the dispute was a private dispute between neighbors; it had no interest, ramifications or consequences beyond them. There was no public debate, and plaintiff had not been contacted by public officials and had received no public complaints about the planned party until after the neighbor complained and the article was published. The Superior Court concluded the newspaper could not make a public figure out of private person merely by writing about a private matter and thereby drawing attention to it.

Here, a brazen criminal act of breathtaking proportion had been committed on the public streets within the newspaper's circulation area. When the alleged defamatory article was published, the story was fresh and the newspaper was in hot pursuit of it.[6]

Two men, both well armed, one with ties to the Lehigh Valley and an extensive criminal record consisting of robbing banks, stealing government rocket launchers and escaping from a state prison, came to the Lehigh Valley from Las Vegas for the purpose of robbing an area bank. They committed their robbery in broad daylight, and led pursuing police on an automobile chase in which gunfire was exchanged. One of the robbers was wounded, and both were captured. At the place the robbers made their base of operations, police found sticks of dynamite, sawed-off shotguns and other weapons, bullets designed to cause extensive body damage, ski masks and airplane tickets. Police suspected a third person might also have been involved and return to the robbers' base of operations.

The article raised a number of questions of immediate, public concern involving, inter alia, the safety of the community; the integrity of its banks; the availability of guns and ammunition to former convicts; the brazenness of criminals; the violence in our society; the effectiveness of law enforcement; the deterrence of our criminal justice system; why these robbers chose to come to the Lehigh Valley from Las Vegas to rob a bank; where they stayed and what they did while in

---

6. The bank robbery occurred on January 6, 1994. Casler learned of it the next day, The alleged defamatory article appeared the following day, January 8, 1994.

the Lehigh Valley; and whether other persons were involved with them.

Plaintiff, by his own conduct, was drawn into these questions. He leased the space which became the robbers' base of operations. The leased space was a storage garage in the same building as Wagstaff's. Only one sign, which read "Wm. Wagstaff Auto Repair," was on the building. This connection is sufficiently related to certain aspects of the public controversy—*i.e.* where the robbers stayed and whether other persons might be involved with them—to make plaintiff a public figure for those narrow, limited issues. To that extent, plaintiff found himself in the path of legitimate inquiry.

The alleged defamatory statement, that Wagstaff's Auto Repair was the robbers' base of operations, was germane to the plaintiff's limited participation in the controversy. See *Waldbaum v. Fairchild Publications Inc.,* 627 F.2d 1287 (D.C. Cir. 1980); *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). Accordingly, plaintiff is required to establish defendants published the article with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Id.; Harte-Hanks Communications Inc. v. Connaughton,* 491 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686 (1964), citing *New York Times, supra.* Actual malice must be shown by clear and convincing evidence. *Id.*

Plaintiff contends defendants acted with reckless disregard because they failed to investigate, lacked evidence to support Casler's contention that she received any additional information from police sources, failed to effectively review and edit the article, and failed to follow accepted journalistic procedures. However, it is not relevant whether a prudent journalist would

have exercised more caution than a particular defendant, or would have investigated before publishing. *Id.;* see also, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing). Rather, what is relevant is whether plaintiff can establish defendants had a high degree of awareness that the article contained falsehoods. Plaintiff simply has not met this burden. In fact, plaintiff's building did not contain any outside markings to differentiate between the two spaces.[7] Moreover, prior to publishing the article, Casler interviewed Deputy Chief Monahan of the Allentown Police Department, reviewed the search warrant issued against plaintiff's property and then confirmed the accuracy of the warrant at the district justice's office who authorized the warrant. Casler also could not locate plaintiff for comment prior to publication. The only other way defendants could have ascertained Wagstaff's and the storage garage were separate properties was to search deed records. This is not required. Accordingly, defendants' motion for summary judgment is granted.

## ORDER

And now, April 12, 1999, upon consideration of defendants' motion for summary judgment, plaintiff's op-

---

7. Plaintiff's assertion that the article was false because the storage garage where the robbers resided is separate from Wagstaff's, the loci reported in the article, has no bearing on determining whether defendants acted with actual malice absent a showing defendants had a high degree of awareness of this fact. See *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("there is a significant difference between proof of actual malice and mere proof of falsity.").

position thereto, the briefs of counsel, and after oral argument thereon, and for the reasons set forth in the accompanying opinion, it is ordered that said motion is granted.

It is further ordered that judgment be entered in favor of defendants The Morning Call Inc. and Kristin Casler and against plaintiff William Wagstaff individually and d/b/a Wagstaff's Auto Repair in no amount.